THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EDWARD STOKES, Defendant-Appellant.

First District (5th Division)   No. 1—87—0005

Opinion filed March 31, 1989.

PINCHAM, J., dissenting.

George C. Howard, of George C. Howard, Ltd. & Associates, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund and Kim A. Novi, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COCCIA delivered the opinion of the court:

Defendant Edward Stokes appeals from his 1986 bench trial conviction and sentence for aggravated battery. He was sentenced to two years' probation. Ill. Rev. Stat. 1983, ch. 38, par. 12—4(b)(1).

Defendant, a Chicago fire fighter, was indicted for attempted murder, armed violence, aggravated battery causing great bodily harm, aggravated battery causing permanent disfigurement, and aggravated battery while armed with a deadly weapon, following an August 1984 incident in a Chicago fire station. Following an earlier trial by jury, defendant was found guilty of the charges of armed violence, aggravated battery causing great bodily harm, and aggravated battery while armed with a deadly weapon. Defendant then filed motions for a new trial based in part on grounds that the State had failed to make available to him a prior written statement of the complainant, fire fighter Kenneth Straman, in which Straman related his version of the incident to his Chicago fire department superiors one month after it had occurred. The trial court granted his motions for a new trial, and the matter was assigned to a different judge.

The defendant waived his right to a jury at the second trial, at the conclusion of which he was found guilty of aggravated battery while armed with a deadly weapon. After a motion for a new trial

was denied, defendant brought this appeal.

Defendant now seeks a reversal of his conviction, contending that the State failed to prove beyond a reasonable doubt that he did not act in self-defense with the degree of force justified under the circumstances. He raises several issues which pertain to the sufficiency of the evidence to sustain his guilt.

The incident giving rise to the charges against the defendant occurred on the morning of August 15, 1984, in a Chicago fire department firehouse at 2827 North Pulaski. Both the complainant and the defendant were fire fighters assigned to the firehouse on that day. In addition to their testimony, the court also heard the testimony of a number of eyewitnesses.

Fire fighter Kenneth Straman, the complaining witness, testified at trial that after the 8 a.m. roll call, he entered the firehouse kitchen and saw the defendant opening a package of steak. According to Straman, the steak was one that he had bought on August 6, 1984, when he had been the designated cook for the day. He further stated that on August 6, the defendant had been sent to another firehouse on a "change of quarters," and therefore had not contributed to the fund used for purchasing food on that day. Straman told the defendant that the steak was his (Straman's), but that the defendant could have it if he paid him what it was worth. Defendant agreed to this, and Straman left the room for a short time to get a pen and paper. He returned to the kitchen and began to collect money from the fire fighters so that he could purchase food, as he was the designated cook for August 15. At this time, Ted Eck, Leonard Urbanski, Fakhri Isa, Russell Harper and the defendant were also in the kitchen.

An argument ensued between Straman and the defendant after the latter gave Straman $7, each man's share toward the food fund for the day. Straman told him that he also wanted $3 for the steak which defendant was preparing. Straman told defendant that part of the steak he was preparing belonged to someone else. When defendant proceeded to put the steak in the microwave oven, Straman took it out, threw it on the floor, and then put it into a garbage can.

The argument escalated. Defendant asked Straman to return his $7, saying that he did not want to be in "the club" that day. Straman put $4 on the counter, keeping back the other $3 for the steak. Defendant insisted that Straman return the rest of his money. Straman told defendant that as soon as he had finished collecting money from the others, he would give defendant his money. At this point, Straman had observed defendant holding a coffee cup in his right hand. Suddenly, Straman felt a blow to the left side of his head. When

he looked up, defendant had nothing in his hand. Straman then picked up a plastic garbage can and threw it at defendant, who knocked it down with his hands. The two men then went "at each other," fighting as they fell to the kitchen floor. As Straman began hitting defendant "all over," Ted Eck grabbed him and held him in a "full nelson" as co-workers attempted to break up the fight. Then, as Straman was repeatedly telling Eck to let him go, he felt a sharp pain to the back of his head and then saw a silver object come across his shoulder and "get" him across the chest and stomach.

Straman further testified that as Ted Eck let him go, he turned and saw defendant standing with a knife in his hand and saying, "Come on. Come on." Straman then picked up a toaster and held it in front of his chest and stomach to defend himself as he walked toward a door leading out of the kitchen and away from the defendant. He was screaming hysterically, "Why were you holding me?" On his way out of the kitchen, he placed the toaster on a table. He then wandered out onto the apparatus floor and sat in a chair. Paramedics arrived shortly thereafter and took Straman to Northwest Hospital, where he was treated for lacerations and remained hospitalized for approximately three days.

On cross-examination, Straman testified that when Ted Eck held him in the full nelson by the refrigerator, he was about three or four feet away from where the defendant was standing. As he was being held, he felt several blows to his side and stomach area, near his ribs, but could not recall seeing anyone on either side of Eck. He described himself as being 5 feet 11 inches tall and described Ted Eck as being about the same height.

Straman's courtroom testimony was consistent with his signed written report of September 15, 1984, to his superiors. The statement relates Straman's version of the August 15 incident in further detail. It described the argument over the steak, his throwing the steak away, and his feeling a "hard blow to [his] left ear where [he] had been struck by a coffee cup thrown at [his] head by Stokes." The report also states that he threw a plastic trash can in front of the defendant and wrestled him to the floor. The statement in evidence further described that as his co-workers were breaking up the fight, one of them grabbed him in a "full nelson" while the defendant was hitting him "furiously in the stomach and back." The other fire fighters told him to "cool down," but Straman was telling him to let him go as he wanted to get away from the defendant. Then, seconds apart, he first felt a blow to the back of his head from a knife and then saw a knife coming down which slashed him in the chest "while

[he] was still being held in a full nelson."

Fire fighter Ted Eck, testifying for the State, recalled that about 13 men were working in the firehouse on the day of the incident, including three officers. After roll call, he went to the kitchen, sat down and read a newspaper. Fire fighters Isa, Urbanski, Straman, and the defendant were also in the kitchen. He saw Straman collecting money. He heard an argument between Straman and the defendant about a steak, but did not hear any details of the argument. After about five minutes, he left the kitchen to avoid the argument, then returned about three to five minutes later. After giving Straman some money, he went into the eating area of the kitchen with his newspaper. He looked up when he heard something breaking on the floor, and saw Straman pick up a two-foot tall garbage can and throw it at the defendant, who warded it off. He could not recall whether the can actually hit the defendant. Then Straman and the defendant met on the inside of the kitchen counter and fell to the floor, out of Eck's view. Eck testified he then walked over to the area where Straman and the defendant were, and observed Straman punching and kneeing the defendant about the torso as the defendant was trying to get Straman off him. At this time, fire fighter Leonard Urbanski was also in the cooking area of the kitchen along with the two men who were fighting. Urbanski asked for help in separating Straman and the defendant. Eck assisted him by pulling Straman off the defendant and taking him over to the refrigerator area, where he held him in a "full nelson." All the while Straman was resisting Eck and telling him to let him go. Then Eck saw an arm, holding a knife of about eight inches in length, come over his shoulder. When he saw the blade being slashed at Straman's chest, he let him go. As Straman backed away, Eck saw blood on Straman's face. Eck then turned around and saw the defendant standing in the middle of the kitchen area with a kitchen knife in his right hand. When defendant had his back turned, Eck put a hug around his shoulders and told him to drop the knife, which defendant did. At that time other fire fighters came into the kitchen. Eck left the kitchen and went out onto the apparatus floor, where he observed Straman sitting in a chair and observed blood on the left side of his face.

On cross-examination, Eck stated that while defendant lay with his back to the floor with Straman over him, defendant's midsection, chest and stomach were struck "many times" by Straman. He (Eck) did not kick or punch the defendant and he did not see anyone else do so. He described the knife attack, stating that the defendant reached over him once with the knife, but slashed at Straman several times.

Once the defendant reached over him with the knife, he began letting Straman go, but he had not yet fully released him at the time he was slashed. He described both Straman and himself as about six feet tall, and both of them as taller than the defendant.

Eck's brief written report to his superiors, dated August 15, 1984, was also admitted into evidence. His report states that during the argument about the steak, defendant asked Straman to return the money he had paid to the club and that Straman did so. It identifies Isa, Urbanski and himself as those who broke up the fight. It makes no reference to defendant punching or otherwise striking Straman initially, or throwing a coffee cup at him. It does not specifically mention a nelson hold being used to restrain Straman, but it does include the statement, "I pulled firefighter Straman off to the side and then firefighter Stokes came after firefighter Straman with a knife."

Fire fighter Leonard Urbanski testified that during the argument, defendant had a coffee cup in his hand and that he threw it at Straman. The cup hit Straman's left ear. As the two men were fighting on the floor, Straman punched defendant in his side and face. After the two had been separated, and while Eck was holding Straman in a nelson, Urbanski was holding defendant in a bear hug, with his arms around defendant's arms and chest. While being held in this manner, the defendant reached for the knife drawer. Although Urbanski tried to hold both defendant and the knife drawer at the same time, defendant managed to get into the drawer. At this point, he released the defendant, who ran at Straman with the knife, hit him once in the back of the head, and then, reaching over Eck's shoulder, cut Straman in the chest and stomach area. Eck then released Straman, who then went for the counter and picked up the toaster, which he held in front of his abdomen. When Straman put the toaster down, Urbanski noticed that he had been cut in the stomach and chest area and was bleeding from the ear. He also recalled that Eck reached around defendant from behind and told him to drop the knife, which he did. He further stated he was 5 feet 10 inches tall and that defendant was "a little taller." He described defendant as being bigger than he was in both height and weight.

On cross-examination, Urbanski testified that from where he was standing about eight feet away, Straman had "a pretty good swing" as he fought with the defendant on the kitchen floor. Straman, while straddling the defendant, struck him in the side of the head and in the face. Urbanski summoned Eck and Isa to help in breaking up the fight. Eck grabbed Straman from behind, placed him in a full nelson, and pulled him over by the refrigerator. The defendant got up, and

Urbanski immediately grabbed him and held him by the sink, but he managed to get his arm free and into the knife drawer. Urbanski "just backed off" while defendant ran over toward Straman and Eck. He did not have enough time to warn them.

Urbanski's one-paragraph report, written for his fire department superiors on the date of the incident, comports with his testimony at trial as to the matters it relates. In the written report Urbanski states that he saw the defendant strike Straman in the face at the time of the argument. The report was silent as to a coffee cup. After he and one or more persons, not specifically named, had succeeded in breaking up the fight, the defendant opened a drawer and then started striking Straman with a knife.

Fire fighter Fakhri Isa's testimony substantially corroborated that of the State's other witnesses. He testified that he saw defendant punch Straman with his right arm after Straman threw some money on the counter, but from where he was standing, he did not see defendant's hand connect with Straman and did not observe whether defendant had anything in that hand. During the fight on the floor, Straman kneed defendant in the head and punched him in the side and upper body. Defendant tried to fend off the punches, but did not punch Straman. Then Urbanski grabbed defendant's hand to try to help him up, while at the same time calling to Isa for help in breaking up the fight. Isa went over and helped Eck pull Straman off the defendant, then assisted Urbanski with the defendant. Eck, meanwhile, grabbed Straman and held him in a nelson. Straman was moving all the while Eck held him in that position. When defendant obtained a knife from the drawer, Urbanski released him. The defendant then reached over the shoulder of Eck and the right shoulder of Straman once, and made two up and down stabbing motions.

Isa's written report to his superiors regarding the incident was written on the date of the incident and stated the facts in summary fashion. It was also introduced into evidence. While lacking in detail, Isa's written statement is not inconsistent with his testimony at trial. It states that after a 10-minute argument over a steak, the defendant punched Straman and the two began fighting on the kitchen floor. The report specifically states that after the two had been separated, the defendant reached into the knife drawer, pulled out a knife, and began "hacking away" at Straman.

Dr. Albert Mitsos, a licensed general surgeon, testified that he examined Straman in the emergency room of Northwest Hospital on the morning of the incident. Straman had a wound in his right chest and a wound to his left ear. He operated on Straman's chest immediately

after his examination and called in a plastic surgeon to perform surgery on the ear. Dr. Mitsos described Straman's left ear as having two distinct wounds. On the front or exterior part of the external ear was a satellite wound. In Dr. Mitsos' opinion, this wound was caused by a blunt instrument, such as a fist or club or anything that would cause an impact. This wound was not a cut. The other wound was in the back of the same ear, directly behind the first wound, at about the place where the ear joins the head. Dr. Mitsos characterized this wound as a laceration or cut, a linear wound approximately two inches long. In his opinion, the instrument which caused the wound to the front of the ear did not cause the wound to the back of the ear. The wound to the back of the ear was caused by a cutting instrument, consistent with a knife. He further testified that the damage to the ear from both front and back wounds combined to create a through-and-through injury, or hole, in the ear.

Dr. Mitsos described the injury to Straman's chest and abdomen as a "superficial" linear slash wound, approximately 10 inches long, extending from the right chest about two inches below the nipple down to the upper abdomen about two inches below the breast bone. This wound was approximately one-quarter inch deep, extending through the skin tissue to the outer coating of the muscle. It was similar to the wound on the back of Straman's ear, with the same consistencies.

The defendant testified on his own behalf and stated that he had been a Chicago fire fighter for 6½ years at the time of the incident. Straman and the other witnesses had been fire fighters for approximately the same length of time, but he was senior to all of them. He had also served in the United States Marine Corps for four years, including 13 months of combat duty in Vietnam. He testified that he was 5 feet 9 inches tall and weighed 185 pounds at the time of the incident. Prior to the incident, he had had disagreements with Straman on two occasions. The first occurred about two weeks earlier concerning bunk priorities in the firehouse. The argument was heated. Although Stokes, who had seniority, explained his rationale in selecting Straman's bed on that basis, nonetheless Straman threatened to physically attack Stokes. No physical altercation took place.

The second incident involving Straman occurred about one week prior to the knifing incident, when the men were at the scene of a fire. Straman grabbed defendant, swung him around, and cursing loudly, accused him of carrying a piece of fire equipment which Straman said was his, but which Stokes had previously selected to use that day.

In addition to problems with Straman, Lieutenant Donald Ellwood had not spoken to the defendant for 8½ months prior to the August 15 incident. Stokes attributes this to what the defendant described as a "racial problem" that Ellwood had with him. Stokes also stated that he had had a problem with fire fighter Isa. Stokes had wanted to be transferred to a fire station where there were at least some other black fire fighters. He had put in two transfer requests to Chief Robert Poder prior to August 15 for this purpose although he had not stated his reason for making these requests.

Defendant's version of the August 15 incident differed in several significant respects from those of the other witnesses. He testified that the steak around which the argument centered was one that had been left over from August 12, the last day of Stokes' service as the cook. When Straman insisted that the steak was his and that he (Stokes) was not to eat it, the defendant told Straman that there were two other steaks in the refrigerator that he could have, but that if Straman wanted to argue about it, he would cut this steak in half. After taking the portion of the steak he had cut for himself out of the microwave oven, he placed it on a plate on the counter. Straman then walked around the counter from where he had been standing, picked up the steak from the plate, threw it on the floor, stomped on it and placed it in the garbage can.

Stokes then told Straman that he no longer wanted to be in the club and asked for his money back. Straman took $3 and threw it into the dishwater in the sink. Stokes reached into the sink with his left hand, picked the money up out of the dishwater, put his coffee cup down and reached with his right hand for the rest of his money. Straman refused to give him the rest of the money. After more words were exchanged, he told Straman that he was going to walk around to the other side of the counter and when he got there he wanted his $4. The men started walking toward each other. Then Straman picked up the garbage can and threw it at him. He threw up both hands trying to deflect it. At that moment, one of the fire fighters who was standing to the side of him, grabbed his arm and knocked it down. The corner of the garbage can hit Stokes in the left forehead. As the defendant started to go back toward the counter, Straman charged and both fell to the floor, with Stokes flat on his back and Straman on top of him.

As Straman was trying to punch him, he also felt himself being kicked in his side and in the back of his head. He knew that the kicks could not be coming from Straman. Then he grabbed Straman's tee shirt, twisted it, and slammed Straman's head against the counter.

Because he was still being kicked badly from behind, he let Straman go. Straman stood up, and as he also started to get up, Straman reached over to the counter in back of them and grabbed a toaster. Straman raised the toaster over his head as if he were going to come down and hit Stokes with it. Seeing Straman hold the toaster this way, Stokes grabbed the butcher knife, still sitting on the counter, which he earlier had used to cut the steak. He held the knife directly out in front of his chest to keep Straman from coming at him with the toaster. Then Straman walked up on the knife, still holding the toaster and trying to hit him with it. He "pulled the knife down" as Straman walked up on him, and pushed Straman back, off him.

After Straman had been cut, Stokes stood there with the knife in his hand and said, "Now, all of you want to jump on me, come on and jump on me while I have the knife in my hand." No one said anything. Defendant then dropped the knife, walked out of the kitchen, went to a washroom to rinse his face, and then walked out onto the apparatus floor. There he saw Straman, Eck, Urbanski, Isa, Ellwood, and another fire fighter, Russell Harper. A side compartment of a fire truck was open and except for Straman, the other fire fighters were going into the compartments and taking out pipes, poles, crowbars and sledgehammers. Startled by what he saw, the defendant put his hand on the handle of his fire department ax, which was leaning near the wheel of a truck. He said he was not going to take a beating any more. Then engineer Ralph Gamberdella came up to him and told him that things had gotten out of hand and to go back into the kitchen, which he did. In the kitchen he bent down near the counter and picked up the rest of his money and told Isa, who was now standing in the kitchen, "You guys shouldn't have kicked me and punched me like that."

Defendant presented several photographs in evidence of the injuries which he said he received during the fight. He indicated a contusion on his forehead as a result of the heavy, full fiberglass garbage can striking him, a bruise under his left arm where he was kicked in the ribs while he was on the floor, and bruises to his left side and to the back of his head which he stated also resulted from the kicking. Stokes further testified that during the time he was in police custody, from approximately 8:45 a.m. to approximately 1:15 a.m. the next day, he never received any medical treatment for his injuries, although he requested treatment from police detectives Michael Brogan and Robert Doelker and also from Assistant State's Attorney John Hynes. After his release from police custody, he received medical treatment at a Humana clinic in Chicago and returned to this clinic

about four times for treatment. He was also treated by the fire department physician about five times and did not return to work for about four weeks after the incident. The photographs of defendant's injuries and his clothing were taken eight hours after his release from police custody and nearly 24 hours after the incident at the firehouse, and it was so noted by the court. On cross-examination defendant also admitted that it was not until approximately 8 a.m., following his release from police custody, and only after he had first gone to the fire station to pick up his paycheck, that he sought medical treatment.

Defendant also presented the testimony of two fire department personnel as to his reputation for quietness and truthfulness. Chief Robert Poder stated that he had worked in the same fire station as the defendant prior to the incident in question and that defendant had a good reputation for being a peaceful and law-abiding citizen. He also had a good reputation for truthfulness. Lieutenant John Wesley Paramore, a fire fighter who had known the defendant since May 1980, and who had worked with him in another firehouse, testified that Stokes had a good reputation for peacefulness and that his reputation for truthfulness was "impeccable." However, on cross-examination, Poder also stated that had Stokes requested a transfer from his assigned station house, the transfer would have had to go through him in the normal chain of command. He did not recall either seeing or signing any transfer request from defendant prior to August 15, 1984.

Engineer Ralph Gamberdella, an eyewitness to events on the apparatus floor immediately following the knifing incident, testified for the State that defendant not only put his hand on his fire department ax while he was on the apparatus floor, but also picked up the ax and held it with the head of the ax at about shoulder level while he (Gamberdella) asked him several times to put the ax down. Stokes eventually lowered the ax, having completely released it only after Ted Eck walked over and grabbed the ax handle. At no time that morning did Gamberdella see any of the fire fighters with crowbars or sledgehammers in their hands.

The State also presented several rebuttal witnesses. Police officer Brogan, who was called to the firehouse immediately after the fight, testified that the only injury he noticed was a bruise over defendant's eye. Detective Robert Doelker, also called to the firehouse that morning, stated that defendant never told him that he required medical attention or showed him any injuries under his shirt. Police officer Robert Zielinski, on duty as lockup keeper from 6 a.m. until 2 p.m. on August 15, 1984, did not notice that defendant had any injuries and further stated that he never would have taken him into the lockup if

he had injuries, because under a police department general order, an injured suspect must be taken to a hospital first.

John Hynes, an assistant Cook County State's Attorney and a felony review assistant at the time of these events, testified that when he interviewed defendant on the day of the incident, he noticed only a slight red mark on defendant's forehead. He did not recall the defendant requesting any medical attention. On cross-examination, he also recalled that defendant had told him about feeling kicks to his side and punches to his head as he lay on the kitchen floor and that someone other than Straman had kicked him. Stokes also told Hynes that he had reached up and grabbed "something" from the counter and swung once, but he did not tell Hynes that Straman advanced on him holding a toaster over his head.

OPINION

■■ Defendant contends on appeal that he acted in self-defense. He reasons that he reached for the knife on the counter only after he had been attacked by more than one person and then saw Straman coming toward him with the toaster poised to strike. Once the affirmative defense of self-defense is raised by a defendant, the State has the burden of proving beyond a reasonable doubt, not only all the elements of the offense, but also that the defendant's act was not in self-defense. (*People v. Ross* (1981), 100 Ill. App. 3d 1033, 1038, 427 N.E.2d 955, 959; *People v. Seiber* (1979), 76 Ill. App. 3d 9, 13, 394 N.E.2d 1044, 1048.) The State will have carried its burden when any of the evidence produced at trial negates an element of the defense beyond a reasonable doubt. *People v. Wilks* (1988), 175 Ill. App. 3d 68, 72, 529 N.E.2d 690, 693; *People v. Seiber* (1979), 76 Ill. App. 3d 9, 13, 394 N.E.2d 1044, 1048.

■■■ The elements of self-defense are defined in section 7—1 of the Criminal Code of 1961:

"A person is justified in the use of force against another when and to the extent he reasonably believes that such conduct is necessary to defend himself *** against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself ***." (Ill. Rev. Stat. 1985, ch. 38, par. 7—1.)

This court has more specifically delineated the elements justifying the use of force in defense of a person as follows: (1) that force is threatened against a person; (2) that the person threatened is not the ag-

gressor; (3) that the danger of harm is imminent; (4) that the force threatened is unlawful; (5) that the person threatened must actually believe: (a) that a danger exists, (b) that the use of force is necessary to avert the danger, (c) that the kind and amount of force which he uses is necessary; and (6) that the above beliefs are reasonable. Furthermore, the use of deadly force is limited to those situations in which (a) the threatened force will cause death or great bodily harm or (b) the force threatened is a forcible felony. (*People v. Williams* (1965), 56 Ill. App. 2d 159, 165-66, 205 N.E.2d 749, 752.) A trial court's findings on the elements of self-defense raise a question of fact, which a reviewing court will not disturb unless the evidence supporting the finding is so unsatisfactory as to justify a reasonable doubt of guilt. *People v. Wilks* (1988), 175 Ill. App. 3d 68, 73, 529 N.E.2d 690, 693.

The facts of this case clearly establish, and the parties do not dispute, that defendant's use of a large kitchen knife under the circumstances was use of deadly force. There is also no question that defendant's testimony, that more than one man assaulted him and that Straman came toward him with a toaster, was sufficient to raise the issue of self-defense. We therefore proceed to consider each of the above elements of the defense as applied to defendant's actions.

■ First, the court heard uncontroverted testimony that a garbage can was thrown at defendant by the complainant just before the two men wrestled to the floor. It was also the testimony of the combatants, and every eyewitness, that Straman punched the defendant at least several times as he lay on the floor. As such conduct by Straman was at least tortious, if not criminal, it is evidence that unlawful force was threatened against the defendant. Defendant further maintained at trial that more than one person assaulted him as he lay on the floor, that he received kicks to his head and ribs, and that Straman then advanced on him with a toaster, threatening further force. However, the other eyewitnesses presented a different version of the fight. They testified that only Straman administered blows to the defendant and that three co-workers cooperated in separating the combatants. They further testified that Straman only briefly held the toaster in front of his abdomen to protect himself after Stokes had slashed him with a knife. The two versions of the incident are irreconcilably conflicting, and the trial court was not required to accept defendant's version. (*People v. Wilks* (1988), 175 Ill. App. 3d 68, 73, 529 N.E.2d 690, 693.) The court was also free to consider that defendant presented no corroborating testimony as to the type and extent of injuries he suffered during the incident and that the State presented

rebuttal testimony by persons who saw and spoke to him shortly thereafter. Taking all of the evidence into consideration, the trier of fact could reasonably conclude that after the two combatants had been separated by several co-workers who were still on the scene and actively engaged in keeping them apart, the danger of further harm to the defendant was not imminent at the time he retrieved a knife and attacked complainant.

■ In addition to threatened unlawful force and imminence of harm, another element which must be present in order to justify the use of force in defense of person is that the person threatened is not the aggressor. The evidence relating to this element was also conflicting, with defendant testifying that he never punched or threw a coffee cup at Straman, and the State's eyewitnesses stating otherwise. Fire fighter Isa testified at trial and also indicated in his written report that before the garbage can was thrown, the defendant had punched Straman. Furthermore, Urbanski corroborated Straman's testimony that the defendant threw a coffee cup at him. Thus, there was sufficient evidence for the trier of fact to find that the defendant was the initial aggressor. There was also ample evidence to support a conclusion that even if Stokes were not the initial aggressor, he became the aggressor by his act of reaching for a knife and advancing on Straman, after the fight had been broken up and Straman had been disabled by Eck's nelson hold. The use of deadly force generally cannot be justified as self-defense once the aggressor has been disabled or disarmed, nor does the right of self-defense justify an act of retaliation or revenge. *People v. Chatman* (1981), 102 Ill. App. 3d 692, 700, 430 N.E.2d 257, 263; *People v. Woods* (1980), 81 Ill. 2d 537, 543, 410 N.E.2d 866, 869.

■ To satisfy the fifth and sixth elements of the defense, it must be determined (1) that Stokes actually believed that a danger existed, and that the use of deadly force was necessary to avert the danger, and (2) that, if he did so believe, these beliefs were reasonable. A defendant is not required to be correct in his assessment of the danger presented by a set of circumstances, and a belief may be reasonable even if he is mistaken. (*People v. Williams* (1965), 56 Ill. App. 2d 159, 166, 205 N.E.2d 749, 753.) The question is whether the facts as they appeared to the defendant at the time and under the circumstances there present were such as to indicate to him, as a reasonable person, that he was in danger of losing his life or suffering great bodily injury. *People v. Duncan* (1924), 315 Ill. 106, 111, 145 N.E. 810, 812.

■ Applying these principles to the instant case, we hold that the

totality of the evidence presented the trier of fact with a sufficient basis for concluding that defendant did not actually believe that his actions were necessary to avert his imminent death or great bodily harm; and also that if he did so believe, this belief was not reasonable under the circumstances.

Three eyewitnesses testified that the two combatants had been separated by co-workers. According to their accounts, only Straman had assaulted defendant during the fight, and no one was threatening the defendant when he made two attempts to retrieve a knife from a closed drawer. Furthermore, apparently no one else in the room was armed at this time, including the complainant. The incident took place in daylight hours among fire fighters of the same company, in their fire station, at a time when, according to fire fighter Eck, there were approximately 13 men in the station, including three officers. Also, based upon defendant's own testimony, he was a Marine combat veteran weighing about 185 pounds at the time and clearly able to handle himself in a fight with one other person. Taking all the evidence into consideration, the trial court could have reasonably determined that defendant's use of deadly force was not based upon a reasonable apprehension of death or great bodily harm in light of his assessment of the situation at the time he used such force against the complainant.

Therefore, we conclude that the evidence presented at trial was sufficient to negate any of the following four elements of self-defense beyond a reasonable doubt: (1) the defendant as nonaggressor; (2) the imminence of harm; (3) the defendant's actual belief in the danger of death or serious bodily harm and the necessity of using deadly force to avert it; and (4) the reasonableness of such belief under the circumstances.

■■ ■ Defendant also contends that the evidence presented by the State is insufficient in two respects. First, he maintains that it was highly improbable, if not impossible, for him to have cut Straman in the manner described by the State's witnesses, *i.e.*, over the shoulders of two men taller than he, and while the victim was being held in a full nelson by the other man. Second, he asserts that each of the State's eyewitnesses changed his account of the altercation to comport with Straman's written statement to his superiors, compiled one month after the incident. He contends that the other fire fighters' written statements of August 15, 1984, in totally failing to mention that Straman was held in a full nelson and not including other details to which these same fire fighters testified at trial, thoroughly impeach these witnesses.

It is well established that where a jury is waived, it is a function

of the trial court to determine the credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence, and where the evidence is irreconcilably conflicting, to ascertain the truth. (*People v. Mays* (1980), 81 Ill. App. 3d 1090, 1098-99, 401 N.E.2d 1159, 1165-66.) On appeal, all evidence is weighed in the light most favorable to the prosecution, and the relevant question for the reviewing court is whether any rational trier of fact could have found the elements of the crime to exist beyond a reasonable doubt. A reviewing court will not substitute its judgment for that of the trial court on questions of evidence or credibility of witnesses and cannot reverse a criminal conviction unless the evidence or the credibility of the witnesses is so improbable or unsatisfactory as to raise a reasonable doubt of guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277; *People v. Mays* (1980), 81 Ill. App. 3d 1090, 1099, 401 N.E.2d 1159, 1165-66.) However, it has been held that this rule is not inflexible, and when the record does not support the factual determinations, a court of review must reverse. *People v. McCarthy* (1981), 102 Ill. App. 3d 519, 522, 430 N.E.2d 135, 137.

After a careful review of the record in this case, including the written statements of complainant and the other fire fighters and their in-court testimony, we conclude that the fire fighters' brief summary reports concerning the incident are consistent with both the nature and sequence of events as are more fully related in their courtroom testimony and in complainant's written statement. They are consistent with the use of a nelson hold to restrain Straman and with the defendant's grabbing a knife in the manner testified to by these same eyewitnesses at trial. Furthermore, their weight and credibility as corroborative evidence is enhanced by the trial testimony of fire fighters Eck, Urbanski and Isa as to the circumstances under which the reports were written. They wrote the reports isolated from each other, in separate rooms, with no others present. Eck and Isa specifically testified that they had no opportunity to speak to the other fire fighters prior to writing their summaries. In short, none of the eyewitnesses to the incident were materially impeached by their prior written statements, which are merely abbreviated accounts of the same event, highlighting various observations from each man's unique perspective.

There remains the issue of whether the manner of defendant's knife attack, as described by the complainant and the State's eyewitnesses, was so improbable as to raise a question of defendant's guilt. It is clear from the testimony presented at trial that although Straman and Eck were admittedly taller than the defendant, they were not significantly taller in terms of defendant's physical ability to

reach over and around the shoulder of one or both of them. This is especially so when it is considered based on the testimony of Eck and Isa, that Straman was struggling and trying to release himself from Eck's hold during the attack, and not necessarily standing upright and in any one position during this altercation. Perhaps the most significant testimony was that of Dr. Mitsos, a disinterested witness. His testimony is entirely consistent with the State's version of how Straman's injuries were inflicted; it is totally inconsistent with the defendant's version of using the knife only to ward off an attack with the toaster, as he faced Straman, and pulled the knife down and across the chest of Straman, as the complainant advanced upon him.

We therefore conclude that the evidence is not so improbable as to require a reversal of the trial court's factual conclusions in this case.

We hold that the evidence in the record was sufficient to permit the trier of fact to conclude that the State met its two-fold burden: (1) that of proving beyond a reasonable doubt not only all the elements of the offense, but (2) also that the defendant's actions did not constitute self-defense as defined by the Criminal Code and interpreted by the courts of this State. Accordingly, the judgment of the trial court is affirmed.

Affirmed.

LORENZ, J., concurs.

JUSTICE PINCHAM, dissenting:

I dissent. A review of the trial record before us reveals the following: (1) despicable racism preceded and permeated the altercation between the complainant Kenneth Straman and the defendant Edward Stokes; (2) neither the complainant Straman, the defendant Stokes, nor the witnesses to the altercation were candid in their versions of what transpired; (3) it was practically a physical impossibility for the defendant Stokes to have inflicted the complainant Straman's chest injury in the manner related by the witnesses; and for these reasons (4) the evidence fails to prove the guilt of the defendant beyond a reasonable doubt.

Tragically, the complainant Straman, the defendant Stokes and the witnesses, all fire fighters, public servants of the highest order, and upon whom society daily relies, and whose exceedingly dangerous duties, and frequently their very survival, demand fierce and dedicated loyalty to and support for one another, were unable to control, but indeed exasperated their racial animosities and hostilities against

each other. Stokes vigorously argues that he, the defendant, was the only black involved and that all the other persons involved, the complainant Straman, all the other fire fighters, the police officers, the assistant State's Attorney, who witnessed, investigated and testified about the altercation, were all white. Defendant Stokes' attorney before this court, who was also his trial attorney, candidly admitted on oral argument that the trial evidence established that the case was putrid and festered with racism, but which was unconvincingly denied by the assistant State's Attorney on oral argument. A review of the trial evidence, however, unfortunately substantiates the defense attorney and, regretfully, refutes the prosecutor. This is the first case in my 40 years in the legal profession in which racism is so prevalent and so glaringly apparent. Its grotesque presence should not be buried and concealed in the record, but rather, it should be exposed for the world to see, as a deterrent beacon against the future commission of similar deplorable behavior.

### RACISM—THE ALTERCATION'S PRELUDE

Defendant Edward Stokes testified that he served four years in the United States Marines, was a Viet Nam combat veteran and that he was honorably discharged. He was a Chicago Transit Authority bus driver for 13 years, during which time he also worked a second job as a janitor for the Chicago Board of Education. He had been accepted as a Chicago policeman and was in the Chicago police department's academy training program for a brief period before he became employed as a City of Chicago fire department fire fighter. At the time the altercation occurred in the case at bar, Stokes had been a fire fighter for seven years. Robert Poder testified that he was a battalion chief and had been a fire fighter of the Chicago fire department for 30 years. He related that he had known the defendant Stokes for four years prior to the date on which the altercation occurred and that Stokes had a good reputation for being a peaceful and law-abiding citizen and for being truthful.

John Wesley Paramore testified that he was a lieutenant in, and had been a fire fighter with, the Chicago fire department since 1977 (seven years), that he knew defendant Stokes and that Stokes had a good reputation for being peaceful and law abiding.

Complainant Kenneth Straman testified that he was 28 years of age and that he had been employed as a Chicago fire department fire fighter for 6½ years. In August 1984, when the altercation occurred, he was assigned to truck 14 at the Diversey and Pulaski Chicago fire department fire station. Straman had worked at this fire station for

about six months to a year prior to the August 15 altercation. Stokes was already assigned to that fire station when Straman arrived there. Straman also related that he and Stokes worked the same shift.

Defendant Stokes testified that about two weeks before the altercation on August 15, 1984, he had an argument with complainant Kenneth Straman about one of the fire station bunk beds. Under the seniority rule at the station, a fireman with more seniority than Stokes had taken Stokes' bunk. Stokes, who had one month seniority over Straman, then took Straman's bunk. Straman threw the bed linen on the floor, stepped on it and told Stokes he was going to kick his ass. Straman admitted that he had this argument with Stokes about the bunk, but denied that he threatened to kick Stokes' ass.

Stokes testified that shortly after the bunk argument, at the scene of a fire to which they had been called to extinguish, Straman called him dirty names about a fire pole, a piece of fire equipment that Stokes had chosen to use. Straman also admitted that this argument occurred.

Stokes further related, without contradiction, that for eight months prior to the August 15 altercation, Chicago fire department Lieutenant Donald Ellwood never spoke to him. Stokes testified, "It was a racial problem. He [Lt. Ellwood] had a problem with that. I don't know why." Stokes had made two requests for a transfer to another fire station because of racial problems in the Pulaski and Diversey fire station.

### THE FOOD PURCHASING AND COOKING CUSTOMS AND PRACTICES IN THE FIRE STATION

Straman testified that there were three shifts working at the fire station, 13 men to each shift; that each shift had its own refrigerator and that there was a fourth refrigerator used by all the shifts. On each shift each day a cook is selected from among the men, and on each shift the cook for the day collects a money pot from each man on the shift.

> "Q. Mr. Straman, my question is, what were the rules concerning leftover, uncooked food from a shift? The general rule as to uncooked food that is purchased?
>
> A. Usually if there is any uncooked food, usually it is not touched until the cook decides what he is cooking the next day. Until he decides what he is cooking for the meal. Other than that he doesn't use it, somebody else will prepare it for themselves [sic]."

Straman further testified:

"Q. Could the people on the 9th [of August] have eaten the food left over from the 6th? Would that have been the generally acceptable practice?

A. General practice on certain occasions, yes. Certain occasions."

Complainant Straman's testimony and the uncontradicted testimony of the other State's witnesses and defendant Stokes clearly established that on August 15, 1984, immediately preceding the altercation between them, Straman not only ignored but indeed affirmatively and deliberately violated the foregoing custom of the fire station regarding leftover food and maliciously instigated the affray with Stokes.

### THE LEFTOVER STEAKS

Straman testified that on August 6, he was the cook on his shift, that he collected money from the men on his shift with which he purchased the food for that day. Included in the food he purchased were approximately 10 steaks, he did not know the exact number, but only one of the steaks belonged to him. Straman prepared one meal, the lunch meal, that day, but he did not prepare the steaks for lunch. The steaks were purchased for the evening meal. Straman did not recall who prepared the evening meal for August 6 because he was not in the station at that time. Some of the steaks were left over after the evening meal and put in the shift refrigerator. The steaks did not have any kind of label on them.

Straman testified that he was off the next two days, August 7 and 8, that he returned to work on August 9 but he could not remember whether he was the cook on that day. Nevertheless, Straman testified that when he returned to work on August 9, he saw the steaks he purchased on August 6 and at that time it appeared to him that there were three steaks left.

Straman did not work on August 10 or 11. He returned to work on August 12, but he was unable to remember if he was the cook on that day. When Straman came to work on August 15, nine days had passed since he purchased the steaks for the shift on August 6.

As previously noted, Straman also testified that it was the generally accepted practice for the firemen to prepare for themselves and eat food left over from previous days. Straman also testified that the uncooked food that he purchased on August 6 could possibly have been eaten by some of the firemen on his next workday shift on August 9. More importantly, State witness fire fighter Gamberdella testified that the steaks in the refrigerator on August 15 had been pur-

chased on August 12 for the whole engine company, which included Stokes, who had contributed to their purchase.

### STRAMAN CONFRONTS STOKES

Straman testified that when he reported for work on August 15, he agreed to be the shift cook for that day. He entered the kitchen and observed Stokes standing near the microwave opening a package of steaks which Straman claimed were a part of the steaks he purchased on August 6 when he was shift cook. Straman told Stokes, "That's my steak," and that Stokes could have it if Stokes gave him what the steak was worth and Stokes said okay. Straman left the kitchen and went to his locker for a pen and paper to make out the grocery list and to collect and keep tabs on who gave and the amount of money given.

When Straman returned to the kitchen, Stokes gave him $7. Straman said to Stokes, "How about three more dollars for the steak?" Stokes said, "I thought you were joking." Straman told Stokes that he was not joking and said, "I told you the steak was mine."

Leonard Urbanski, a State's witness, 27 years of age, a Chicago fire fighter for $6\frac{1}{2}$ years and also assigned to the Pulaski and Diversey fire station, testified that in the $6\frac{1}{2}$ years that he had been a fire fighter he had never paid a fellow fireman any money for leftover, uncooked food and that no fireman had ever made any such demand upon him.

Straman likewise testified that during his entire $6\frac{1}{2}$ years as a fireman, he had never before demanded money from any fellow fireman for leftover food, prior to his demand of Stokes on August 15. Straman also testified that he did not know of any other fireman having made any such demand upon a fellow fireman.

Fakhri Isa, a State's witness, a Chicago fire fighter for $6\frac{1}{2}$ years and also assigned to the Diversey and Pulaski fire station for five years, testified, on cross-examination:

"Q. If some steak was purchased on August 6th, 1984, and it was purchased with each man in the shift making contributions and let's assume that steak, not all of it was consumed on the 6th, that some of it was left, on the morning of the 15th of August, 1984, when you arrived at work, if you wanted to prepare some of the steak that was in your shift refrigerator, would you have had to pay one of the firemen for it?

A. *No*." (Emphasis added.)

Ted Eck, a State's witness, a Chicago fire fighter for $6\frac{1}{2}$ years and assigned to the Diversey and Pulaski fire station, testified that on

August 15 he did not know the rule in the firehouse relative to uncooked food, but that if a steak was found in the shift refrigerator on August 15 which was left from August 6, he simply would ask the cook on August 15 if he could have the steak before he cooked it.

Ralph Gamberdella, also a State's witness, a Chicago fire fighter for 25 years and assigned to the Diversey and Pulaski fire station, testified that in the 25 years that he had been a Chicago fire fighter, he had never paid a fellow fireman for leftover food from a shift refrigerator, and he could not remember if any such demand had ever been made of him.

These foregoing testimonies for the State unequivocally established that the complainant Straman, in absolute contravention of the established fire station customs and practices, deliberately and hostilely confronted defendant Stokes about a steak, which did not belong to Straman. The following testimony of Stokes is further illustrative of Straman's obnoxious behavior.

Stokes testified that he reported for work at the Diversey and Pulaski fire station on August 15 about 7:30 in the morning, went to roll call, thereafter gave the day's cook, Kenneth Straman, $7, his share to purchase food for the shift for later in the day and that he then went into the kitchen to prepare his morning meal. Fire fighter Leonard Urbanski was also in the kitchen cooking toast. Stokes looked into the refrigerator and noticed some leftover steaks from August 12, the day Stokes last cooked. Stokes took one steak from the refrigerator and prepared to place it in the microwave. Straman entered the kitchen and said, "Stokes, that's my steak." Stokes told Straman that the steak was not his, that there were more steaks in the refrigerator and if he wanted a steak he could have one of those. Parenthetically, I note that Stokes' testimony that there were other steaks in the refrigerator is uncontradicted and undenied, but indeed, as hereinafter disclosed, it is corroborated by Straman and other State witnesses.

Stokes further testified that Straman told him that he was not going to eat the steak and Straman began to argue with him about the steak. Stokes told Straman that if he wanted to argue about that steak, he could cut the steak in half. It was the practice at the firehouse to buy large sirloin steaks so that two men could share one steak. Stokes used a butcher knife to cut the steak in half, wrapped up one-half and put it back in the refrigerator. Stokes then put the other half he cut for himself in the microwave to defrost, during which Straman continued to argue about the steak and told Stokes that he was not going to eat it.

The following unrefuted events, related by the harmonious and corroborating testimonies of the complainant Straman, all the other State's witnesses and the defendant Stokes, further reveal Straman's reprehensible, insulting and provocative conduct.

Straman testified that Stokes proceeded to cook the steak and that when Stokes took the steak out of the microwave, he, Straman, took the steak, threw it on the floor, picked it up and threw it in the garbage. (Nevertheless, Stokes retained his poise.) Straman related that Stokes then went to the shift refrigerator, took out the other half of the steak he had cut and put it in the microwave. Again, I parenthetically note that from this testimony of Straman, Straman knew that there was at least another steak in the refrigerator for him, if he wanted it, when he threw the steak that Stokes was cooking on the floor and into the garbage.

State's witness fire fighter Fakhri Isa also testified that when Stokes put a steak in the microwave, Straman went to the microwave and took the steak out, threw it on the floor and then threw it in the garbage, after which Stokes got another steak out of the refrigerator and put it in the microwave.

Stokes similarly related Straman's abhorrent and offensive behavior. Stokes stated that when the microwave bell went off, he took the steak out and laid it on the counter; that Straman walked around the counter, took the steak, threw it on the floor, stomped it, picked it up and threw it in the garbage. Stokes added that Straman then got right up in his face and said to him, "You motherfucker, you ain't gonna eat that fuckin' steak and I mean that."

Straman's obnoxious conduct which immediately followed is not only uncontradicted, but it is admitted by Straman and corroborated by the other State witnesses, fire fighters and the defendant Stokes. After Straman threw the steak in the garbage and continued to argue with Stokes, Straman testified:

> "Q. What did the defendant say while you were still arguing?
>
> A. He said, 'If you're going to be a cry baby about this, I want out of the club. Give me back my seven dollars.'
>
> Q. Did you give him back any money?
>
> A. Yes, I did.
>
> Q. What did you give him?
>
> A. I gave him four dollars.
>
> Q. Where did you put it?
>
> A. On the counter in front of him."

Straman related that Stokes, having given Straman $7 continued to demand the balance of $3 and that he refused to give it to him, and

told Stokes that he would give him the money after he finished making up the list.

State's witness fire fighter Leonard Urbanski stated that Stokes told Straman that he did not want to be in the club and wanted his money back. State's witness fire fighter Fakhri Isa also related that after Straman took the steak out of the microwave and threw it on the floor and then in the garbage, Straman threw some money on the counter and Stokes said to Straman, "Don't fuck with me. Give me my money. I will get out of the club." Isa testified that Straman told Stokes that he would keep the rest of the money for the price of the steak.

According to this foregoing testimony of complainant Straman, and State's witnesses, fire fighters Urbanski and Isa, defendant Stokes exercised remarkable restraint, forbearance and admirable tolerance and temperance.

Stokes testified that when Straman threw the steak on the floor and then in the garbage and told Stokes that he wasn't going to eat the steak, and that he meant that, Stokes asked Straman if he was having a tantrum and what was wrong with him. Stokes stated that he asked Straman for his money back and told Straman that he did not want to be in the club, that he would not eat that day because Straman was the cook. Stokes repeatedly asked Straman to return his money and told Straman that he would leave out of the kitchen area so that they would not have to see each other. Stokes related that Straman threw $3 in the dishwater in the sink. Stokes further testified:

"Q. What happened then?

A. [Straman] said, 'I am not going to give you a fuckin' thing. This is for the steak.'

Q. Then what happened?

A. I explained to him, I said, 'Well, you're the one who threw the steak on the floor and in the garbage can. Now why do I have to pay for the steak? Just give me my money, I don't want any trouble, and I will leave the kitchen.'

Q. Then what happened?

A. I told him, I said I am coming around the other side of the counter and when I get around there I want my four dollars.

Q. What happened then?

A. He started walking towards me and I started walking towards him."

It is at and following this point on this disdainful scenario that the

testimonies of the complainant Straman and the other State witnesses are in dispute, contradictory and unconvincing. Likewise, a fair assessment of portions of Stokes' testimonial version of the events which followed is that it is also unpersuasive.

### THE STATE WITNESSES FIRE FIGHTERS' REPORTS

Each of the State's witnesses, Chicago fire fighters Ted Eck, Ralph Gamberdella, Leonard Urbanski and Fakhri Isa, prepared individual written reports to his superiors of what he observed of and his involvement in the incident, immediately after the incident had occurred. Complainant Straman, however, without explanation, did not prepare his written report of the incident to his superior until September 15, 1984, over a month after its occurrence on August 15, 1984. On September 15, when complainant Straman prepared his report, Straman was the only person who stated, and for the first time in his September 15 report, that he was cut by defendant Stokes as he, Straman, was being held in a full nelson hold by other fire fighters. Stokes vigorously argues that the fire fighter State's witnesses altered and changed their versions of the incident as stated in their written reports to their different trial testimonial versions to coincide with, to aid, to protect and to corroborate Straman's 30-day belated September 15 report and Straman's concomitant trial version. Therefore, Stokes vehemently urges, the belated trial testimony of the State's witness fire fighter was contrived. It is noteworthy that at the defendant Stokes' first trial, Straman testified that he could not remember whether he had made a written report of the incident for his supervisors. At another point during Stokes' first trial, Straman testified that he did not make such a report. It was after the defendant's first trial that the defendant's attorney first discovered that Straman had made his postponed September 15 report of the incident, which was the basis for the granting of Stokes' motion for a new trial.

The majority is quite correct in stating that fire fighters Eck, Urbanski and Isa "wrote the reports isolated from each other, in separate rooms, with no others present," and "that they had no opportunity to speak to the others prior to writing their summaries." (185 Ill. App. 3d at 659.) The majority's conclusion "that the fire fighters' brief summary reports concerning the incident are consistent with both the nature and sequence of events as more fully related in their courtroom testimony" is grossly and glaringly erroneous. (185 Ill. App. 3d at 659.) Moreover, quite uniquely and ingenuously but just as fallaciously, the majority relies on the fire fighters' isolation in prepar-

ing and in the brevity of their reports as justification for their reports' omissions and contradictions. This justification is utterly ludicrous. As hereafter disclosed, the majority's ill-founded and contradicted summations that "none of the eyewitnesses to the incident were materially impeached by their prior written statements, which are merely abbreviated accounts of the same event, highlighting various observations from each man's unique perspective" are inaccurate and really nonsensical. (185 Ill. App. 3d at 659.) These witnesses were impeached by their own and each others' reports and testimonial contradictions and omissions. Their numerous contrary versions of the altercation cannot be consistently, logically, factually, inferentially or reasonably reconciled.

### THE FIGHT: ROUND I

Beginning with complainant Straman's testimony that he put the $4 on the counter in front of defendant Stokes, after which Stokes told Straman to give him his money, the defendant had a coffee cup in his right hand. Straman testified that he then said to Stokes, "As soon as I am done writing this down I will give you your money." Straman related that immediately thereafter he felt a sudden painful blow to the left side of his head. He looked up and Stokes was in front of him with nothing in his hand. Apparently this testimony was designed to inferentially establish that Stokes struck Straman with the coffee cup on his left ear, which was injured during the altercation. Straman related that he went on the other side of the counter, picked up a garbage can and threw it at Stokes, who knocked it down with his hands.

State's witness fire fighter Ted Eck testified that he heard Straman and Stokes arguing in the kitchen over a steak, he left the kitchen and when he returned Straman and Stokes were on opposite sides of the counter still arguing. Eck further related that he began reading the paper and he heard something breaking, again, ostensibly, Stokes' coffee cup. Eck testified that he looked up and saw Straman pick up the garbage can and throw it at Stokes, who, again, blocked it with his hand.

Eck admitted that he did not see Stokes strike Straman but that he did see Straman strike Stokes in his upper chest and stomach. More importantly, Eck was compelled to admit that he did not put in his report, prepared by him on the date of and shortly after the incident on August 15, that he heard a breaking noise before he saw Straman pick up the garbage can. This impeachment by omission is quite significant.

State's witness fire fighter Leonard Urbanski's testimony of this phase of the altercation is similarly impeached. Urbanski swore that he saw Stokes *throw* the coffee cup and strike Straman on the left ear. Urbanski did not know if Stokes picked up the coffee cup to throw it or whether it was already in his hand. According to Urbanski, Straman then picked up a garbage can and threw it at Stokes, who, again, blocked it with his hands.

Urbanski, like Eck, was also compelled to admit that in his written report of the incident to his supervisors, prepared by him promptly after the incident, he never stated that he saw Stokes strike Straman on the ear or in the face with a coffee cup. Moreover, Urbanski further confessed that he never stated in his report that Stokes blocked the garbage can when Straman threw it. This impeachment by omission is likewise material.

State's witness fire fighter Fakhri Isa's testimony of this facet of the incident flatly contradicted the testimony of State's witnesses fire fighters Eck and Urbanski. Additionally, Isa's trial testimony was similarly impeached by his August 15 report to his superiors. Isa testified that when Straman threw the money on the counter and told Stokes that he would keep the rest of the money for the price of the steak, Stokes said to Straman, "Give me my money. Don't fuck with me." Straman was on the outside and Stokes was on the inside of the counter, facing each other. Isa stated that Stokes then struck Straman with a right punch. Unlike Urbanski's testimony, Isa did not testify that Stokes threw and/or hit Straman with the coffee cup. In fact, Isa testified on cross-examination that he did not see anything in Stokes' hands when Stokes struck Straman in the face with his fist and that he never saw Stokes throw a coffee cup and strike Straman on the head.

Defendant Stokes testified that he did not strike Straman with a cup. Stokes related that when he told Straman that he was coming around to the other side of the counter and that when he got around the counter, he wanted Straman to give him his $4, he started walking towards Straman and Straman started walking towards him. At that point Straman picked up a garbage can and threw it at Stokes. Stokes said that he threw up his hands to try to ward off the garbage can but the corner of the garbage can hit him on his forehead.

### THE FIGHT: ROUND II

Straman, Eck and Urbanski testified that immediately after Straman threw the garbage can at Stokes, Straman and Stokes came together fighting and fell to the floor, with Stokes on his back on the

bottom and with Straman on the top, and while in that position on the floor Straman repeatedly beat Stokes about his face, head and body, and that Stokes tried to get Straman off of him.

Stokes, however, testified that when Straman threw and hit him on the head with the garbage can, he, Stokes, turned to go back towards the counter, at which time Straman came over the counter and plunged on him, which caused them both to fall to the kitchen floor, with Stokes flat on his back and Straman on top of him. Stokes related that as they were in this position on the floor, Straman began beating him in the face and head. Stokes grabbed the collar of Straman's T-shirt, twisted it and repeatedly slammed Straman's head against the counter cabinet door, which Stokes insisted caused the injury to Straman's ear.

### THE FIGHT: ROUND III

It appears from the evidence that it was later during the altercation that Stokes cut Straman across his chest, in a manner as related by the State's witnesses the defendant argues could not possibly have physically occurred. What is unclear and is not proven beyond a reasonable doubt, indeed, what is befuddled, contradicted and disputed by the impeached and contrary testimony of the State's witnesses are the facts and circumstances of (1) Stokes' acquisition of the knife; and (2) Stokes' infliction of Straman's injury with the knife.

State's witness fire fighter Urbanski testified that as Stokes was on the floor, Straman was straddled on top of Stokes punching him and Stokes was attempting to get Straman off of him by pushing him away. Urbanski and Eck went over to break up the fight. Eck held Straman in a nelson position and pulled Straman off of Stokes while Urbanski held Stokes in a bear hug. According to Urbanski, Stokes then attempted to go into a counter drawer to get a knife but Urbanski knocked his arm away; nevertheless, Stokes somehow managed to get away from Urbanski, go into the drawer and get a knife. Urbanski further related that Stokes ran over to where Eck was holding Straman in a nelson hold. Stokes hit Straman twice, once in the back of the head, and then, according to Urbanski, Stokes reached over Eck and Straman (in a purported manner which was attempted to be described, as hereafter set forth herein), and cut Straman in the chest area.

Significantly, there was nothing in Urbanski's report to his superiors about Stokes getting a knife out of a drawer, and Urbanski never stated in his report that Stokes cut Straman while Eck held him in a nelson. Not only that, but also it was not in Urbanski's report that he

saw Stokes strike Straman with a knife at all. Urbanski so acknowledged. Urbanski further admitted that he did not write in his report any of the material things to which he testified during the trial. These recondite omissions in Urbanski's report on these highly material matters clearly impeached Urbanski's trial testimony on these matters.

Urbanski related that after Stokes cut Straman, Eck released Straman, Straman picked up a toaster from the counter and held it in front of himself, and that after Straman put the toaster down, Urbanski could see that Straman was cut in the chest area.

State's witness fire fighter Isa testified that after Straman threw the garbage can at Stokes, he, Isa, and Urbanski grabbed Straman in a full nelson and Urbanski held Stokes in a bear hug from behind. Isa related that Stokes then took a knife out of the drawer, ran over and "started hacking away at Straman over Eck's right shoulder," at which time Isa ran out of the kitchen and yelled, "Stokes is stabbing everybody." Isa stated that he did not and no one else said anything by way of warning to Straman or Eck as Stokes attempted to go into the drawer to get the knife, or as Stokes ran over with the knife to Straman and Eck.

Isa was shown his statement, the report of the incident that he wrote shortly after it had occurred, on which he was cross-examined, and testified, as follows:

"Q. In the report that you made out on August 15th, 1984, did you say anything in that report about Mr. Eck grabbing Mr. Straman in a Nelson?

A. No.

Q. Did you say anything about Mr. Eck holding Mr. Straman?

A. No.

Q. Did you say anything in that report about the fact that Eck was holding Straman at the time Straman was cut?

A. No.

Q. Did you say anything in that report about Stokes reaching over Eck and Straman and cutting Straman in the chest and abdomen area?

A. No.

Q. Did you say anything in that report about Urbanski attempting to prevent Stokes from getting in a drawer?

A. No, I didn't."

Isa then penitently admitted that he did not see Stokes cut Straman.

State's witness fire fighter Ted Eck testified that as Stokes was on the floor on the bottom and Straman was on top punching and

kneeing him, Stokes tried to get Straman off of him. Eck stated that he and Urbanski tried to break up the fight, Eck pulled Straman off of Stokes and held him in a full nelson hold. Straman resisted. Eck said that he saw an arm come over his shoulder with a knife stabbing at Straman and he released his nelson hold on Straman and let Straman go. Straman fled out of the kitchen. Eck said nothing about Straman picking up a toaster off the counter upon being released. Eck turned around and saw Stokes standing in the middle of the floor with a kitchen knife in his hand. Eck grabbed Stokes by his shoulder and told him to drop the knife and Stokes did so.

Eck was shown his statement and report of the incident to his superiors which he too prepared shortly after the incident occurred and which was used to further impeach by omission Eck's trial testimony. After stating on cross-examination that he did not know if Straman was cut when he was in the grip of Eck's nelson hold, Eck acknowledged, contrary to his trial testimony, that he said nothing in his report about Stokes cutting Straman while Eck held him in a nelson hold. Eck further admitted that in his statement he likewise did not say that he saw Stokes cut Straman or that he saw any injuries to Straman.

Straman stated that after he threw the garbage can at Stokes, he and Stokes fell on the floor, Stokes was on the bottom and he was on top hitting Stokes as they lay on the floor. Some co-workers grabbed Straman and broke up the fight. Eck held him in a full nelson and Straman told Eck to let him go because "I wanted to get away." Straman related that he then felt a sharp pain to the back of his head and saw a silver object come across his shoulder onto his chest. Eck let him go and when he turned around he saw Stokes standing there with a knife in his hand. Straman said that when he saw Stokes with the knife he picked up a toaster and held it in front of his chest and stomach. Straman walked out of the kitchen.

Straman acknowledged that he first prepared a written report of the August 15 incident a month later, on September 15. He admitted, however, on cross-examination that he was questioned by police officers about the incident shortly after it had occurred. He further testified on cross-examination:

> "Q. Did you tell Officer Doelker that during this argument that was had between you and Stokes that he punched you and you two grabbed each other and fell to the floor?
>
> A. I don't recall.
>
> Q. *And did you also tell Officer Doelker that as you were being separated that Stokes picked up a knife and slashed you*

*across the abdomen?*

A. *I don't recall."* (Emphasis added.)

Stokes rigidly contends that not only does the foregoing impeached and contradictory trial testimony of the State's witnesses fail to prove his guilt beyond a reasonable doubt, but also, and more importantly, Stokes insists that it was physically impossible for him to have inflicted the cut on Straman's chest in the manner described by the witnesses in their belated trial testimony.

Straman displayed to the trial judge the scar across his chest, which was then described as running from the right nipple on a diagonal to the center of his chest. Doctor Albert Mitsos, a State's witness and emergency room physician at Northwest Hospital who treated Straman at the hospital on August 15, described Straman's chest wound as a superficially linear slash wound about 10 inches in length.

Ted Eck, who testified he held Straman in the full nelson, also testified that he was 6 feet tall and several inches taller than Stokes. Straman stated that he and Eck were about the same height and that Stokes was shorter than both of them.

The purported positions of Eck holding Straman in a full nelson when Stokes reached over Eck's shoulder and inflicted the cut on Straman's chest were demonstrated by the State's witnesses to the trial judge and were also displayed on oral argument before this court. Stokes argues that from these displays, and considering also that he was several inches shorter than both Eck and Straman, it is apparent that he could not have approached Eck from behind, reached over his shoulder and then reached over Straman, while Eck held Straman in a full nelson position, and inflicted a diagonal, ten-inch superficial slash wound on Straman's chest from his right nipple toward the center of Straman's chest.

### THE UNJUST DECISION. THE LOSER—STOKES

Although this contention of Stokes may have some validity, it is unnecessary and I do not decide the merit of Stokes appeal on this basis. It is clear to me and I conclude that the foregoing contradicted and impeached testimony of the State's witnesses on the facts and the acrimonious circumstances in this case fail to prove the guilt of the defendant of the offense of aggravated battery beyond a reasonable doubt.

It is the function of the trial court to determine the credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence. (*People v. Mays* (1980), 81 Ill. App. 3d 1090, 1098-99, 401 N.E.2d 1159, 1165-66.) Moreover, a re-

viewing court will not substitute its judgment for that of the trial court on the credibility of witnesses or on the evidence, but a court of review must reverse a criminal conviction where the evidence and/or the credibility of the witnesses are so improbable or so unsatisfactory as to raise a reasonable doubt of guilt. *People v. Mays* (1980), 81 Ill. App. 3d 1090, 1099, 401 N.E.2d 1159, 1165-66; *People v. McCarthy* (1981), 102 Ill. App. 3d 519, 522, 430 N.E.2d 135, 137; *People v. Comer* (1979), 78 Ill. App. 3d 914, 397 N.E.2d 929.

The majority and I agree on the legal principles that are involved in and applicable to the instant case. Contrary to the majority's conclusion that application of those legal principles justifies affirmance of the defendant's conviction of the aggravated battery offense, I am of the firm opinion that those same legal principles when applied to the testimony of the State's witnesses in the case at bar demand reversal.

Stokes' testimony of the facts and circumstances of his infliction of Straman's chest wound is just as unconvincing as the testimony of the State's witnesses. Stokes, however, was not required to prove his innocence, beyond a reasonable doubt, or otherwise. The burden to prove Stokes' guilt beyond a reasonable doubt was permanently on the State.

Stokes testified that while he was on the floor and Straman was on top of him beating him, he slammed Straman's head against the counter cabinet door, during which time he, Stokes, was repeatedly kicked. Although Stokes never expressly so stated, it is clear, however, that he intended to infer that it was the other fire fighters, and not Straman, who kicked him. Stokes stated that because he was being kicked from the back, he let go of Straman. Straman got up, and he, Stokes, started to get up. As Stokes did so, Straman reached on the counter, grabbed the toaster, raised the toaster up over his head to come down and hit Stokes with it. Stokes stated that he then grabbed the butcher knife on the counter which he had used to cut the steak and held the knife out in front of him to keep Straman from coming up on him with the toaster. Stokes' version of the immediate subsequent events appears to be somewhat implausible:

"Q. After you held the knife in that manner, what happened?

A. He walked right upon the knife with the toaster trying to hit me with it.

Q. What, if anything, did you do?

A. I pulled the knife down like that and I pushed him back off of me.

Q. You swung the knife?

A. No. Didn't actually swing with it, but I had the knife like

this, up, and I came down with the knife like that when he walked up on me.

Q. What happened then?

A. It was just like a complete still came over the kitchen."

Straman had been cut and he left the kitchen. Stokes dropped the knife on the kitchen floor, walked out of the kitchen into the bunk room and rinsed his face.

State's witness fire fighter Ralph Gamberdella testified that after the altercation between Straman and Stokes was over in the kitchen, he saw Stokes on the apparatus floor pick up an ax and hold it shoulder level. He asked Stokes to put the ax down and Stokes released the ax only after Ted Eck grabbed it. First, this testimony does not contribute to the proof of the alleged offense for which Stokes was on trial. Second, Stokes denied these acts attributed to him by Gamberdella. Third, Gamberdella's testimony on this apparatus room-ax incident was impeached by Gamberdella's admission that he, too, like the other State's witnesses regarding other events, never mentioned this significant event in his report of the incident to his superiors.

Finally, I am constrained to point out that I vehemently disagree with the majority's assessment that the testimony of Straman's hospital emergency room physician, Dr. Mitsos, "is entirely consistent with the State's version of how Straman's injuries were inflicted" and "totally inconsistent with the defendant's version of using the knife only to ward off the attacker with the toaster." (185 Ill. App. 3d at 660.) My review and analysis of Dr. Mitsos' testimony is just the opposite.

I am of the firm conviction that one of the supreme obeisant and most revered issues presentable to a court of review for determination is whether under the law the evidence establishes the guilt of a convicted defendant beyond a reasonable doubt. In the case at bar, under the law the evidence fails to establish Stokes' guilt aggravated battery beyond a reasonable doubt and Stokes' judgment of conviction should therefore be reversed. Accordingly, I dissent.