THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL WILSON, Defendant-Appellant.

(Nos. 54116, 54569 cons.; )

First District—January 6, 1972.

Gerald W. Getty, Public Defender, of Chicago, (Shelvin Singer, Assistant Public Defender, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (William Hedrick, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

An indictment charging the defendant Michael Wilson with the murder of Joseph Farland was pending in the Criminal Division of the Circuit Court in July 1968. On July 31st Wilson's counsel answered ready for trial but the case was continued on order of the court to August 28th. On August 13, 1968, after notice to the defendant on August 12th, the case was advanced for trial on the State's motion, a jury was selected and the cause was tried. Wilson was found guilty of murder and sentenced to imprisonment in the penitentiary for a period of 14 to 25 years.

Wilson contends that the advancement of the trial date deprived him of his right to present witnesses and denied him the effective assistance

of counsel. He also insists that the evidence was not sufficient to prove him guilty beyond a reasonable doubt.

Farland died on August 26, 1967, and Wilson was indicted for his murder on October 25, 1967. After approximately 11 continuances the cause was advanced because an eyewitness to the homicide, Claude Hudson, who was home on furlough from active duty with the United States Army, was about to be sent out of the country. The defendant's attorney objected to the advancement from August 28th to August 13th, 1968. He represented that he could not get his witnesses in on such short notice and that Wilson's mother, who was his means of access to some of the witnesses, was out of the State.

The trial judge stated that the court was open that day (August 13th) for a trial but was not sure it would be in the next week after that. He said the State's case would take a day or two and the defendant would have plenty of time to secure his witnesses and every effort should be made to proceed. The case was held on call and the trial was started in the afternoon.

The defense presented the testimony of the defendant and four witnesses, two of whom were prsent when the crime took place. The last of these witnesses was heard on August 16th, the fourth day of trial. The witness appeared in court during the conference on instructions and the judge permitted him to testify over the State's objection. In the discussion preceding his testifying, the defendant's attorney said that there were at least four more witnesses whom he had been unable to locate but who would have been available if the trial date had not been changed.

■■ A court may vacate an order continuing a criminal case and require a defendant to go to trial over his protests. (*Sampson v. People* (1900), 188 Ill. 592, 59 N.E. 427.) The test of the propriety of the order is whether the defendant was prejudiced. In the present case the cause had been continued a number of times, the defendant's counsel had been in the case many months and had answered ready for trial just fourteen days before the case was advanced. No showing was made as to the materiality of the testimony of the missing witnesses; no offers of proof were made as to what their testimony would have been; no suggestion was made that the State stipulate to their testimony, and no request was made at any time during the trial for a continuance (Ill. Rev. Stat., 1967, ch. 38, par. 114—4(f)) to locate and subpoena them. Since the record does not disclose that the defendant was prejudiced or denied substantial justice, the order of the court re-setting the trial date cannot be held improper.

Hudson testified that there was bad blood between Farland and Wilson. Their quarrel was renewed on August 26, 1967, when they met about 1:45 A.M. on the corner of Pulaski Road and Gladys Avenue, Chicago. Farland said, "I heard you have been looking for me." Wilson replied, "What of it?" and placed his hand in his pocket as if he had a weapon. Farland, who was unarmed, reached for him but Wilson broke away, picked up two bottles and threw one which struck Farland. Hudson and Farland tried to restrain him but could not.

As Wilson ran away a police car passed by. Wilson hailed it and told the officers that Farland and Hudson were out to get him. He also said that Farland had pulled a knife and cut his clothes. The officers searched the three men but found no weapons. They were advised to forget about their altercation and go home. Several people had gathered, among them Wilson's stepfather who owned a nearby restaurant. Wilson was turned over to him and they walked away. Hudson testified that before Wilson left he said he was not willing to forget about the quarrel.

Farland and Hudson walked north on Pulaski. As they walked on, Hudson heard footsteps behind him, turned and saw Wilson with a butcher knife in his hand. Wilson exclaimed, "You know, I'm for real" and plunged the knife into Farland's chest. Hudson chased Wilson but he escaped. He surrendered to the police the next day.

Police officers came to the scene. No weapons were found. Farland was bleeding profusely and was rushed to a hospital. He was stabbed just above the center of his chest; his aorta artery was severed and his left hand was cut.

A sister of Farland saw the stabbing. She testified that two boys sneaked up on her brother. One drew a knife and stabbed him as he threw his hands up. She recognized Wilson as the one who wielded the knife.

Wilson testified that at the first encounter Farland, with whom he had quarreled, approached him with a knife in his hand and said, "You know what you got coming don't you?" He replied, "I ain't got nothing coming." Farland kept creeping up on him so he put his hand in his pocket, pretended he had a gun and said, "Look, don't make me do anything to you. Go on home because I don't want to shoot you." When Hudson intervened he ran around the corner, picked up some bottles and threw them at Farland. Hudson grabbed him and tore his shirt as he broke away. He ran to the street, flagged down a squad car and told the officers, "Those two fellows over there [are] trying to cut me and kill me." The officers talked to the three young men and released them.

Wilson said he and a friend followed Farland and Hudson north on Pulaski and the friend, who had given him a knife, was with him at the

time of the stabbing. He testified that he never intended to kill Farland; that he lashed out at him with his knife only to make Farland give him enough room to pass by. He also said that Farland held an open knife and was coming at him. In a statement to the police after submitting to arrest, Wilson did not say that Farland had a knife or any other weapon.

Two witnesses who were present at the slaying testified for the defense. One said that he heard Wilson and Farland arguing but turned his head away just before the stabbing. He said Wilson had a knife and that Farland had something in his hand which looked like a knife. He turned back in time to see Farland grab his chest and fall to the street. The other witness said he saw Farland take an object from his pocket that looked like a knife or razor and saw Wilson stab him.

■■ The State's evidence was sufficient to sustain the murder verdict. Murder is the killing of an individual without lawful justification, if the person who performs the act causing death, either intends to kill or do great bodily harm to the individual or knows that his act creates a strong probability of death or great bodily harm. (Ill. Rev. Stat., ch. 38, par. 9—1.) Wilson obtained a butcher knife either from his friend or his father's restaurant and followed Farland who was unarmed. He approached Farland from the rear and slashed out at him for the purpose, he said, of getting room to pass. While he asserted that he did not intend to kill Farland, it is not necessary in order to sustain the conviction that he deliberately formed an intent to kill. It is sufficient if at the instant of the assault he intended to do great bodily harm or knew that there was a strong probability that his acts would cause death or great bodily harm. The character of the assault and the circumstances of the slaying, according to the State's evidence, showed Wilson's intention to either kill Farland or injure him severely. Every sane man is presumed to intend all the natural and probable consequences of his act, and if he voluntarily and willfully does an act the tendency of which is to destroy another's life, the conclusion, in the absence of qualifying facts, is that the destruction of that life was intended. *People v. Brooks* (1964), 52 Ill.App.2d 473, 202 N.E.2d 265.

■■ Wilson argues that there was sufficient evidence that Farland had a weapon to justify the reversal of his conviction; he also argues that he acted in self-defense and if he committed any offense it was voluntary manslaughter. Farland's possession of a weapon would not warrant reversal, nor would Wilson's belief that he had. And possession of a weapon by Farland would be but one factor in the defense of self-defense. Of greater importance would be evidence that Wilson had in good faith tried to avoid the fatal confrontation or that Farland was the aggressor. The animosity between Wilson and Farland and the quarrel

which preceded the stabbing were factors for the jury's consideration in determining who was the aggressor at the time of the killing. But even if Farland were the aggressor in the earlier quarrel, this would not of itself prove that he was the aggressor just prior to his being killed.

■■■ To justify the reversal of the murder conviction the evidence would have had to establish that Wilson's act was in defense of his life. To justify the reduction of the crime to voluntary manslaughter, the evidence would have had to establish that at the time he stabbed Farland he believed (but unreasonably so) that the circumstances were such that, if they had existed, it was necessary to stab him in defense of his life. (Ill. Rev. Stat., 1967, ch. 38, par. 9—2(b).) The evidence falls far short of this. Moreover, Wilson's own testimony that he stabbed Farland in order to get enough room to pass him on the sidewalk weakens his argument that he acted in defense of his own life. Whether a killing is justified under the law of self-defense, is a question of fact to be determined by the jury under proper instructions. (*People v. Johnson* (1969), 112 Ill.App.2d 148, 251 N.E.2d 393.) Once a jury has decided this question its verdict will not be disturbed unless the evidence is contrary to the verdict or so unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *People v. McClain* (1951), 410 Ill. 280, 102 N.E.2d 134.

■■ Voluntary manslaughter is also the killing of an individual without lawful justification while acting under a sudden and intense passion resulting from serious provocation. (Ill. Rev. Stat., 1967, ch. 38, par. 9—2(a).) The evidence did not prove that Wilson was acting under a sudden passion at the time of the stabbing. He may have suffered provocation which aroused an intense passion during his first encounter with Farland but the lapse of time between the two encounters would prevent Wilson's provocation, if any, arising from the first to mitigate the second. To reduce an unlawful killing from murder to voluntary manslaughter, the sudden and intense passion resulting from serious provocation cannot be followed by a period of time sufficient for the passion to cool and the voice of reason to be heard.

The judgment is affirmed.

Judgment affirmed.

McGLOON, P. J., and McNAMARA, J., concur.