THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARLOS NEWBERN, Defendant-Appellant.

Fourth District   No. 4—90—0568

Opinion filed September 30, 1991.—Rehearing denied October 30, 1991.

LUND, P.J., specially concurring.

Daniel D. Yuhas and David P. Bergschneider, both of State Appellate Defender's Office, of Springfield, for appellant.

Lawrence R. Fichter, State's Attorney, of Decatur (Kenneth R. Boyle, Robert J. Biderman, and Elliott Turpin, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

Around noon on June 4, 1989, Lawrence Rainer was stabbed to death. Defendant, Carlos Newbern, was charged with killing him and, following a jury trial, was convicted of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1) and sentenced to 40 years in prison. Defendant appeals, arguing that (1) the State failed to prove beyond a reasonable doubt that his use of force in stabbing Rainer was not justified; (2) the statute defining the offense of second degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—2) is unconstitutional because it requires a defendant to prove the presence of a mitigating factor; (3) his conviction for first degree murder should be reduced to second degree murder because he proved the presence of a mitigating factor; and (4) he is entitled to a new trial because he was improperly cross-examined by the prosecutor. We disagree with all of these arguments and affirm.

## I. THE EVIDENCE

During June 1989, Rainer lived with his sister, Versie Rainer, in Decatur, Illinois. Versie testified that on the morning of June 4, 1989, her brother received several phone calls which upset him. However, she was not able to hear his conversations because her brother took the telephone into the bathroom. To her knowledge, he did not make any phone calls that morning. Sometime before noon, her brother got dressed and left the residence, giving no indication of where he was going. He walked west toward Garfield Park. When he left, he had no injuries to his body and he did not appear to be in a hurry.

Around noon on June 4, 1989, Joe Thompson sat on a chair on his front porch to relax and have a cup of coffee. Across the street from Thompson's Decatur residence is a small shelter for a bus stop. As Thompson sat on his porch, he saw no cars on the street or people walking on the sidewalks. Then he noticed two men on the other side of the street walking, not running, from the direction of Garfield Park and towards the bus shelter. As they walked, he saw them "jostling" each other, which he explained as "not squabbling," but "shoulder pushing or elbowing." When asked on cross-examination whether this was the same as one person grabbing another person and pulling away, Thompson responded, "No," that instead, "It was rather, I'd call it, high school or juvenile." The men were "poking" each other and

"shoulder shoving" as they walked, and, to Thompson, it "appeared quite friendly." Thompson did not hear anything the men were saying to each other, nor did he hear the two men raise their voices.

The men stopped at the bus shelter. The next thing Thompson noticed was that one of the men (the "first man") ran to the right from behind the bus shelter while the other man (the "second man") walked to the left from behind the bus shelter. Thompson thought the second man had been injured because as he walked, he seemed to hold his chest or his abdomen. Thompson saw the second man look toward the first man, who was running away, and heard the second man yell, "I'll get you for this."

Thompson's description of the appearance and clothing of the second man matched Versie's description of Rainer as he left his residence that morning. Thompson last saw the second man walk out of his view toward Grand Street.

Thompson saw the first man running away, carrying something, and explained as follows: "I didn't know if it was a club, a brick. He had something as he ran in his left hand."

Thompson first realized something serious must have happened between these two men when, a short time later, he heard sirens coming from the area of Grand Avenue. When he was asked if he had "any clue anything had happened" prior to that time, he responded, "Nothing except two men had an argument or the other guy hit the other one and then ran away."

At approximately noon on that same day, Rainer was found lying in a street not far from Thompson's residence and the bus shelter. He was bleeding from his abdomen and was taken to a hospital, arriving at 12:14 p.m. He was pronounced dead at 12:45 p.m. The autopsy of Rainer's body revealed that he had a stab wound in the area of his lower-left rib cage. The pathologist testified that the cause of Rainer's death was bleeding into his left chest cavity, which in turn was due to the stab wound. He also testified that the knife (which defendant admitted he used in Rainer's stabbing) is the type of weapon that could have caused the stab wound that resulted in Rainer's death.

The pathologist found other injuries on Rainer's body. These included multiple wounds and abrasions on Rainer's forehead above his right eyebrow, consisting of slightly depressed, somewhat red or pink areas; a depressed, dark red region on Rainer's back in the area of his lower right shoulder; some "slender defects in the skin" (apparently, as shown in the autopsy photographs, meaning cuts in the skin), the longest one of which "tends to gape slightly," on Rainer's left shoulder; two "reddish, well outlined regions" on the right side of Rainer's

chest; several "very slender linear—that is line-like, dark defects in the skin" on the upper part of Rainer's lower right arm and the lower part of his upper right arm; a few "linear defects" on Rainer's right arm similar to those previously described; and on Rainer's left arm, in an area near the elbow ("more or less the front medial aspect of the left arm"), several very slender, parallel "defects," which appeared to the pathologist to be "quite fresh." All of these wounds were consistent with being produced by a sharp-edged weapon such as a knife.

With regard to the injuries near Rainer's left elbow, the pathologist testified that they were "compatible with having been received" from the exact moment of death up to two hours before. He believed the other injuries were also recent, but not as clearly so as the elbow injuries. He also testified that the abrasions on Rainer's forehead were consistent with falling into a street but that the "defects" on Rainer's arms were not.

At the autopsy, the pathologist measured Rainer to be 6 feet ½ inch tall and to weigh 178 pounds.

In the early afternoon on June 4, 1989, Decatur police officer Donald Resch interviewed defendant at defendant's request. Defendant wanted to make a battery complaint against Rainer. Defendant told Resch that around noon, defendant was present at Garfield Park when Rainer approached him, and they exchanged words. Defendant ran from Rainer in an eastbound direction, but Rainer caught up with him at a bus shelter. (This turned out to be the bus shelter across the street from Thompson's residence.) Defendant told Resch that when Rainer caught him, they scuffled and defendant ended up on the sidewalk. Rainer punched and kicked him several times and also stomped on defendant's knee. Defendant was finally able to free himself and run away. Defendant told Resch that he last saw Rainer as Rainer was walking away in the other direction.

Defendant showed Resch a small mark under his left eye and stated that he had been injured there when Rainer had either punched or kicked him. Resch did not see any injury on defendant's knee. Defendant never told Resch that he had a knife or that he had stabbed Rainer during this incident. Defendant told Resch that he had been having troubles with Rainer for a long time, that Rainer had threatened him, and that he had previously made complaints about Rainer to the Decatur police department.

Resch testified that because his role was to take the complaint from defendant about Rainer, Resch never asked defendant what he may have done to Rainer. Resch added that he did nothing to prevent defendant from telling everything that happened.

Later that same day, June 4, 1989, Decatur police officer Robert Davis also interviewed defendant, but this interview occurred after the police had become aware of Rainer's death and defendant's connection to it. In that interview, defendant told Davis that he and Rainer had been lovers and that defendant was now seeing another man by the name of Tucker. Defendant said that this upset Rainer and he had been making threats toward defendant. Defendant said that earlier that morning (June 4, 1989), he had received a call from Rainer, who threatened to kill defendant and Tucker. This conversation upset defendant, and after relating the conversation to Tucker, defendant went to the pavilion in Garfield Park. While defendant was there, Rainer appeared and started beating defendant. Defendant ran, but Rainer caught him by the bus shelter, threw him down, and began to beat him again. Finally, Rainer was able to get away and took off running. Defendant never told Davis that he stabbed Rainer, nor did he mention self-defense. However, defendant specifically denied knowing how Rainer had been stabbed or cut at that time.

After hearing defendant's version of events, Davis told defendant that people had seen him with a knife and that the story defendant was telling was not believable. Defendant then said he would tell Davis the truth. In the second version of events defendant gave to Davis, defendant acknowledged that he had a knife to protect himself and that he cut Rainer but did not know where. Defendant said that after he took off running, he hid the knife.

Defendant also told Davis that Rainer caused some injuries by beating him, but Davis was unable to observe any open or bleeding wounds. Davis took some photographs of defendant in order to preserve how he looked that afternoon, and those photographs show no wounds on his body.

During the interview with Davis, defendant held a bag of ice to his left cheek. Davis saw a reddening of that area. He also saw a very slight reddening of the area on the left side of defendant's chest. However, it was so slight that Davis could not find it when shown the photographs he took that day of defendant's chest.

Still later in the afternoon of June 4, 1989, at around 3 p.m., defendant and some Decatur police officers went to a location (at defendant's direction) and recovered a knife that defendant said was involved in the incident. At the time it was recovered, the knife had a "reddish-like substance" on its tip, approximately two inches up the blade, that was later identified as human blood matching Rainer's blood type. Defendant's blood type was different than Rainer's.

At trial, defendant testified that he met Rainer in May 1985 at the Shawnee Correctional Center of the Illinois Department of Corrections in Vienna when they were both serving prison sentences. While there, defendant and Rainer developed a homosexual relationship, which continued after they were released. Defendant said they broke up in July 1988 because Rainer started using cocaine and tried to get defendant to use it as well. However, defendant disapproved of cocaine use. When Rainer used cocaine, defendant testified that "he would jump on me [and] fight me," and that Rainer was a "a crazed psychotic maniac." After defendant moved away from Rainer, he met Tucker and "eventually we became lovers after I had got rid of [Rainer] and his problems." Defendant testified that he lived with Tucker in Decatur at the time of this incident. Because of that, defendant received numerous threatening phone calls from Rainer. Defendant testified that he had made several complaints to the police about Rainer's behavior.

Defendant testified that on the morning of June 4, 1989, he received two phone calls from Rainer in which Rainer swore at him and threatened to kill him. After getting the phone calls, he went to Bobby Jean Carter's house, where Tucker was doing their laundry, and told Tucker about the calls. Carter and Tucker told defendant to calm down, but he was still upset. Defendant and Tucker finished doing the laundry and went home. After eating, defendant left the residence around 11:30 a.m. and took a knife with him. He explained his reasons for doing that as follows:

"I was scared for my life, and I was suffering from mental cruelty. I put the knife in my waistband and went to the park to only settle my mind and ease my nerves because I was scared."

Defendant claimed that he had not told Rainer that he was going to be at the park.

Defendant testified that as he was sitting on a picnic table at the park, Rainer came up behind him, grabbed him around the neck, and started to strangle him. Defendant said that after Rainer beat him at the park, he was able to get away, but only after Rainer kicked him in the face and the side, stomped his leg, and slammed him on the ground. Defendant testified that at that point, he had not struck Rainer at all.

Defendant testified that after he ran out of Garfield Park, he became exhausted and could not run anymore. He said he was just "kind of fast walking, and Lawrence was coming after me." Defendant testified that he kept asking Rainer to leave him alone, but Rainer caught up with him at the bus shelter. Defendant tried to push Rainer away, but Rainer grabbed him, spun him around, and hit defendant in the eye

with Rainer's fist. Rainer then again started to strangle him and was so strong that he could not get away. Defendant claimed that at this point, he was terrified and started to black out:

> "I just had enough strength to get that knife and stick him, stab him one time, not knowing where I stabbed him at because I didn't see him. I was blacking out."

Defendant testified that he was not trying to kill Rainer, but only trying to "get him off of me."

After defendant stabbed Rainer, Rainer released him and defendant ran down the street, gagging for breath. When defendant saw the blood on the knife, he became "really scared," so he hid the knife under a porch and then ran home. After arriving at his residence, he called 911 to report the matter to the police.

Defendant first testified that he did not go to Carter's house after the stabbing but went directly to his own residence. Later, however, after numerous suggestions by his counsel, defendant changed his testimony. He then said he saw Tucker coming down the street with the last of the laundry, and asked defendant, "What's wrong?" They then went to Carter's house, where she gave him a towel with ice in it because "I had a big bruise on my face."

On June 4, 1989, defendant told the police that he was 6 feet 1 inch tall and weighed 190 pounds. He acknowledged being slightly taller and heavier than Rainer.

Defendant admitted that when he first called the police on the afternoon of June 4, 1989, he did not say that he stabbed Rainer. However, defendant did claim to have told Resch that he had a knife and stabbed Rainer in self-defense. Defendant explained that he did not tell the police the "total story" at first because he was "scared and confused."

Tucker testified that he had received threats from Rainer and that he also had made complaints about him to the police. On the afternoon of June 4, 1989, shortly after noon, Tucker testified that he saw defendant at Carter's house as defendant returned from the park. At the time, defendant "was scared and panicking." He was crying and had a bruise on his face. Tucker said defendant also had other bruises on his side and on his knee.

Carter testified that she worked as a licensed practical nurse at Decatur Memorial Hospital. On June 4, 1989, around 11:45 a.m., defendant ran in her back door, crying and screaming. Carter testified that defendant's clothes were torn and he had some blood on him. The blood was on the shoulder of his shirt and also on his pants. Defendant had blood on his knee and on his forehead. Carter put a cold compress

on his face and used a towel to clean him up. He remained at her house for a while before he left to call the police.

In rebuttal, Officer Davis testified that when he talked to defendant on the afternoon of June 4, 1989, he saw no blood on his clothing. Davis took defendant's clothes "into evidence to preserve them for further use," and at trial, he testified that he saw no bloodstains on the garments he examined in open court. On cross-examination, Davis acknowledged that there was a stain on the inside of the pants and he could not say whether it was blood.

In addition to the foregoing testimony, the jury also received various photographs into evidence which portrayed the condition of Rainer's body, the appearance of defendant on June 4, 1989, and various views of the bus shelter where the stabbing occurred. On this evidence, the jury was instructed on first degree murder, second degree murder, and self-defense, and returned a verdict of guilty of first degree murder.

## II. Defendant's Argument That The State Failed To Prove His Use Of Force Was Not Justified

Defendant was charged with first degree murder and presented evidence at trial that he acted in self-defense. Defendant testified that Rainer had threatened to kill him, had pursued him on the day in question, and was beating and strangling him when he stabbed Rainer in order to get away.

Defendant argues that his testimony showed he was acting in self-defense; however, the jury would have been fully justified in concluding (as it apparently did) that defendant's testimony was not believable. Defendant's testimony about fleeing from Garfield Park with Rainer at his heels and then being caught, beaten, and strangled at the bus stop is dramatically inconsistent with the testimony of Thompson, who watched defendant and Rainer walking down the street side by side and "jostling" or "shoulder pushing" each other in a "high school or juvenile" fashion. Thompson described their behavior as being "quite friendly." Further, while there were multiple injuries on Rainer's body, there were almost no noticeable injuries on defendant's body. Additionally, within hours after the incident, defendant told several conflicting stories to the police and, in only the last of those stories, when he finally admitted stabbing Rainer, did he claim self-defense.

Once defendant raised the issue of self-defense, the State had the burden of proving beyond a reasonable doubt not only all of the elements of first degree murder, but also that defendant's stabbing of

Rainer was not in self-defense. (See *People v. Stokes* (1989), 185 Ill. App. 3d 643, 655, 541 N.E.2d 1129, 1136.) The defendant in *Stokes* was charged with attempt (murder) and various counts of aggravated battery and raised the issue of self-defense. The court discussed that issue as follows:

> "The elements of self-defense are defined in section 7—1 of the Criminal Code of 1961:
>
> > 'A person is justified in the use of force against another when and to the extent he reasonably believes that such conduct is necessary to defend himself *** against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself *** [or the commission of a forcible felony].' (Ill. Rev. Stat. 1985, ch. 38, par. 7—1.)
>
> This court has more specifically delineated the elements justifying the use of force in defense of a person as follows: (1) that force is threatened against a person; (2) that the person threatened is not the aggressor; (3) that the danger of harm is imminent; (4) that the force threatened is unlawful; (5) that the person threatened must actually believe: (a) that a danger exists, (b) that the use of force is necessary to avert the danger, (c) that the kind and amount of force which he uses is necessary; and (6) that the above beliefs are reasonable. Furthermore, the use of deadly force is limited to those situations in which (a) the threatened force will cause death or great bodily harm or (b) the force threatened is a forcible felony." (*Stokes*, 185 Ill. App. 3d at 655-56, 541 N.E.2d at 1137.)

We agree with the above analysis and further hold that when the trier of fact has rejected a defendant's claim of self-defense, the standard of review regarding whether the State proved beyond a reasonable doubt that defendant was not acting in self-defense is the same standard applicable to any other element: The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) Under the *Collins* standard, the State has easily shown that a "rational trier of fact" could have found that the State proved beyond a reasonable doubt that the defendant was not justified in the force he used in stabbing Rainer.

### III. THE CONSTITUTIONALITY OF THE SECOND DEGREE MURDER STATUTE

In 1986, the legislature enacted Public Act 84—1450 (effective July 1, 1987) (Pub. Act 84—1450, eff. July 1, 1987 (1986 Ill. Laws 4222)), which amended section 9—2 of the Criminal Code of 1961 (Code) (see Ill. Rev. Stat. 1985, ch. 38, par. 9—2) by repealing the offense of voluntary manslaughter and replacing it with second degree murder (see Ill. Rev. Stat. 1987, ch. 38, par. 9—2). Public Act 84—1450 also amended section 9—1 of the Code by changing the name of the offense of murder to first degree murder. (Compare Ill. Rev. Stat. 1985, ch. 38, par. 9—1, with Ill. Rev. Stat. 1987, ch. 38, par. 9—1.) The new first degree murder statute, in pertinent part, reads as follows:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) He is attempting or committing a forcible felony other than second degree murder." Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a).

The new second degree murder statute reads as follows:

"(a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9—1 of this Code and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed; or

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(c) When a defendant is on trial for first degree murder and evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented, the burden of proof is on

the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code. In a jury trial for first degree murder in which evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented and the defendant has requested that the jury be given the option of finding the defendant guilty of second degree murder, the jury must be instructed that it may not consider whether the defendant has met his burden of proof with regard to second degree murder until and unless it has first determined that the State has proven beyond a reasonable doubt each of the elements of first degree murder.

(d) Sentence.

Second Degree Murder is a Class 1 felony." Ill. Rev. Stat. 1989, ch. 38, par. 9—2.

### A. Defendant's Argument That the Second Degree Murder Statute Is Unconstitutional

In *Mullaney v. Wilbur* (1975), 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881, the Court considered whether Maine could constitutionally require a defendant charged with murder to prove that he acted in the heat of passion on sudden provocation in order to reduce the homicide to manslaughter. The homicide statutes at issue in *Mullaney* read as follows:

" '[Murder:] Whoever unlawfully kills a human being with malice aforethought, either express or implied, is guilty of murder and shall be punished by imprisonment for life.'
***

'[Manslaughter:] Whoever unlawfully kills a human being in the heat of passion, on sudden provocation, without express or implied malice aforethought . . . shall be punished by a fine *** or by imprisonment for not more than 20 years . . . .' " (*Mullaney*, 421 U.S. at 686 n.3, 44 L. Ed. 2d at 512 n.3, 95 S. Ct. at 1883 n.3.)

Under Maine law, the jury was instructed "that if the prosecution established that the homicide was both intentional and unlawful, malice aforethought was to be conclusively implied unless the defendant

proved by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation." (*Mullaney*, 421 U.S. at 686, 44 L. Ed. 2d at 512, 95 S. Ct. at 1883.) After a lengthy discussion on malice aforethought and its historical role in the homicide statutes before it (*Mullaney*, 421 U.S. at 690-96, 44 L. Ed. 2d at 514-18, 95 S. Ct. at 1885-88), the Court held that the Maine homicide scheme was invalid because it shifted the burden of proof on an element of the offense of murder—malice—from the prosecution to the defense. *Mullaney*, 421 U.S. at 703-04, 44 L. Ed. 2d at 522, 95 S. Ct. at 1892.

■ Citing *Mullaney*, defendant argues that section 9—2(c) of the Code violates the due process clause of the United States Constitution by placing on a defendant in a first degree murder prosecution the burden of proving that either of the mitigating factors set forth in section 9—2(a) ("serious provocation" or "unreasonable belief in self-defense") was present at the time of the killing. (Ill. Rev. Stat. 1989, ch. 38, pars. 9—2(c), (a).) Defendant concedes that under *Patterson v. New York* (1977), 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319, the State may constitutionally require a defendant to prove an affirmative defense under certain circumstances, but he argues that *Patterson* is not applicable to the second degree murder statute. Defendant explains this argument as follows:

"The burden of proof under the Illinois statute is analogous to *Mullaney*, under the holdings of the Illinois Supreme Court in *People v. Hoffer*, 106 Ill. 2d 186, 478 N.E.2d 335 (1985) and *People v. Almo*, 108 Ill. 2d 54, 483 N.E.2d 203 (1985). In *Hoffer*, the court specifically held that verdicts of guilty on both murder and voluntary manslaughter (as well as involuntary manslaughter) are inconsistent:

[']The mental states involved in each of these offenses [murder, voluntary manslaughter, and involuntary manslaughter] are mutually inconsistent. Where a determination is made that one exists, the others, to be legally consistent, must be found not to exist.['] *Hoffer*, 478 N.E.2d at 340.

Consequently, if the mental states for first degree murder and second degree murder under the new Illinois scheme are 'mutually inconsistent,' as *Hoffer* held regarding the mental states of murder and voluntary manslaughter, then the defendant is required to prove a mitigating factor which is inconsistent with, and would negate, the mental state element of first degree murder. This burden violates *Mullaney*.
* * *

*** [I]t is clear that Illinois law does recognize the concept of

malice aforethought in its definition of murder. Ill. Ann. Stat., Ch. 38, §9—1 (Committee Comments, at p. 17 (Smith-Hurd 1979); *People v. Guest*, 115 Ill. 2d 72, 503 N.E.2d 255, 266 (1986) ('the legislature intended to retain the common law meaning of express and implied malice but to replace those terms with the more modern and less ambiguous terms of intent and knowledge respectively.') Moreover, like the Maine law in *Mullaney*, the concept of malice aforethought in Illinois has always distinguished murder from voluntary manslaughter. *People v. Evans*, 92 Ill. App. 3d 874, 416 N.E.2d 377, 380 (2d Dist. 1981); *People v. Barney*, 111 Ill. App. 3d 669, 444 N.E.2d 518, 523 (1st Dist. 1982). Under these principles, it necessarily follows that if first degree murder is a killing with malice aforethought, and second degree murder is a killing without malice aforethought, where a determination is made that one exists (*i.e.*, a killing with malice), to be legally consistent, the other (*i.e.*, a killing without malice) must be found not to exist. This question of mutually inconsistent mental states was in fact controlling in the above-cited decision of the Illinois Supreme Court in *People v. Hoffer*, 106 Ill. 2d [at 194-95,] 478 N.E.2d [at] 340 \*\*\*. \*\*\*

\* \* \*

\*\*\* [T]he fundamental constitutional question here remains whether the mental state elements of first degree and second degree murder are in fact 'two inconsistent things: thus, by proving the latter the defendant would negate the former.' *Mullaney*, 421 U.S. at 687. Because the answer clearly must be in the affirmative, the Illinois murder statute violates due process, and [defendant's] conviction must be reversed."

Even though this court recently rejected these arguments in *People v. Buckner* (1990), 203 Ill. App. 3d 525, 530-34, 561 N.E.2d 335, 339-41, and *People v. Clark* (1991), 207 Ill. App. 3d 439, 443-44, 565 N.E.2d 1373, 1376 (see also *People v. Doss* (1991), 214 Ill. App. 3d 1051, 1057, 574 N.E.2d 806, 810, in which the First District Appellate Court cites *Buckner* and *Clark* as it holds the second degree murder statute is constitutional; and *People v. Hrobowski* (1991), 216 Ill. App. 3d 711, 731-32, 575 N.E.2d 1306, 1321, in which the Second District Appellate Court cites *Buckner* and similarly holds that the second degree murder statute is constitutional), defendant asks us to reconsider the issue. We have decided to do so because of its importance and because of the many differing analyses of the second degree murder statute which the appellate court has issued. We believe further discus-

sion of the relationship between the first degree murder and second degree murder statutes is warranted.

### B. *"Malice" and "Less Culpable Mental States" Are Not Part of Illinois' New Homicide Statutes*

The foundation underlying defendant's argument is the decision of the Illinois Supreme Court in *People v. Hoffer* (1985), 106 Ill. 2d 186, 194-95, 478 N.E.2d 335, 340, which held that voluntary manslaughter had a less culpable mental state than murder. Although the court in *Hoffer* never explained the nature of the new, less culpable mental state that supposedly was applicable to voluntary manslaughter, the court nonetheless held that the mental states for murder and voluntary manslaughter were mutually inconsistent, and that "[w]here a determination is made that one exists, the other[ ], to be legally consistent, must be found not to exist." (*Hoffer*, 106 Ill. 2d at 195, 478 N.E.2d at 340.) Yet, a year later in *People v. Wright* (1986), 111 Ill. 2d 18, 488 N.E.2d 973, the supreme court compared the mental states for murder and voluntary manslaughter and reached a conclusion inconsistent with its holding in *Hoffer*, stating as follows:

> "Prior to the enactment of our criminal code of 1961 a conviction for murder required proof that the killing was with malice aforethought. ('Murder is the unlawful killing of a human being, in the peace of the people, with malice aforethought, either expressed or implied' (Ill. Rev. Stat. 1959, ch. 38, par. 358); '[m]alice, either express or implied, is a necessary element of the crime of murder and distinguishes murder from manslaughter' (*People v. Tillman* (1963), 26 Ill. 2d 552, 556).) \*\*\* Malice aforethought was not susceptible to clear definition, and the 'difficult' term was omitted in the definition of murder in our criminal code. (Ill. Ann. Stat., ch. 38, par. 9—1, Committee Comments, at 17 (Smith-Hurd 1979).) The Code states in the part relevant here that the offense is murder if the defendant, when committing the acts which cause death, intends to kill or do great bodily harm, or knows that the acts create a strong probability of death or bodily harm. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1.) With the elimination of malice aforethought as an element of murder the ground was removed on which our courts had held that if a defendant was so intoxicated as to be incapable of acting with malice aforethought, murder was reducible to manslaughter. [Citations.]
>
> *The definition of voluntary manslaughter in our criminal code does not contain language distinguishing it from murder*

*in regard to the defendant's intention or mental state.* Voluntary manslaughter is in relevant part defined simply as criminal homicide committed by one 'acting under a sudden and intense passion resulting from serious provocation' or acting in the mistaken belief that self-defense justified the use of deadly force. (Ill. Rev. Stat. 1981, ch. 38, par. 9—2.) There cannot be a judgment of voluntary manslaughter in the absence of one of these mitigating factors. Thus, murder cannot be reduced to manslaughter unless one of the two statutory conditions is present." (Emphasis added.) *Wright*, 111 Ill. 2d at 27-29, 488 N.E.2d at 978.

We also note that in *People v. Fausz* (1982), 107 Ill. App. 3d 558, 437 N.E.2d 702, defendant was charged with murder, convicted of voluntary manslaughter, and appealed on the ground that the evidence was not sufficient to prove either of the particular circumstances under the voluntary manslaughter statute (see Ill. Rev. Stat. 1979, ch. 38, pars. 9—2(a), (b) (again being "serious provocation" and "unreasonable belief in self-defense")). The appellate court agreed and reversed the conviction, finding that (1) these particular circumstances were elements of the lesser included offense of voluntary manslaughter, and (2) the State did not prove beyond a reasonable doubt that either of these particular circumstances was present. (*Fausz*, 107 Ill. App. 3d at 562, 437 N.E.2d at 705.) On further appeal, the Illinois Supreme Court affirmed the decision of the appellate court and wrote the following:

"The State asserts voluntary manslaughter is an included offense of murder, the only difference being that it requires a less culpable mental state than murder. It contends the evidence in the instant case would have supported a murder verdict. Consequently, the State argues, where the evidence establishes defendant committed murder, it necessarily establishes defendant committed the included offense of voluntary manslaughter. Essentially, the State's position is that a defendant charged with murder may be convicted of the included offense of voluntary manslaughter as long as there is evidence to support a murder conviction even though the evidence fails to establish either of the mental states of voluntary manslaughter. ***

* * *

The record does not disclose any evidence which would establish defendant acted in the 'heat of passion' or that he believed the killing was justified but his belief was unreasonable. The State does not point to any evidence to support the volun-

tary-manslaughter conviction; instead it argues such evidence is not necessary. We disagree. *** 'In a murder trial, a defendant may properly be found guilty of the lesser offense of voluntary manslaughter, but only if the evidence adduced at trial establishes the necessary elements of that offense.' [Citations.] We hold the reversal of defendant's voluntary-manslaughter conviction was proper." *People v. Fausz* (1983), 95 Ill. 2d 535, 539-41, 449 N.E.2d 78, 80-81.

Consistent with the *Fausz* case, the pattern jury instructions (Illinois Pattern Jury Instructions, Criminal, Nos. 7.04, 7.06, at 62, 65 (2d ed. 1981)) told the jury that in order for it to be able to convict a defendant of voluntary manslaughter, the State has to prove beyond a reasonable doubt the presence of either "serious provocation" or "unreasonable belief in justification." Yet, despite the fact that the State had this burden of proof, in cases in which the jury was instructed on murder and voluntary manslaughter, it was often the prosecutor who argued that the evidence failed to show the presence of either of these circumstances, while the defendant often argued that one or both were present.

This confusion and inconsistency regarding Illinois homicide law did not go unnoticed (see, *e.g.*, O'Neill, *"Murder Least Foul": A Proposal to Abolish Voluntary Manslaughter in Illinois*, 72 Ill. B.J. 306 (1984); O'Neill, *"With Malice Toward None": A Solution to an Illinois Homicide Quandary*, 32 De Paul L. Rev. 107 (1982); Haddad, *Allocation of Burdens in Murder—Voluntary Manslaughter Cases: An Affirmative Defense Approach*, 59 Chi.-Kent L. Rev. 23 (1982)), and it was in this context that Public Act 84—1450 was enacted, effective July 1, 1987, replacing murder and voluntary manslaughter with first degree murder and second degree murder.

Despite the confusion and inconsistency surrounding the mental states applicable to murder and voluntary manslaughter, defendant argues that the legislature, when it enacted Public Act 84—1450, intended to retain the notion that the definition of first degree murder included "malice aforethought," whereas the definition of second degree murder did not. While we conclude that defendant's claim is incorrect, we concede that some other districts of the Illinois Appellate Court have held otherwise. For instance, in *People v. Swanson* (1991), 211 Ill. App. 3d 510, 515, 570 N.E.2d 503, 506, the First District Appellate Court held that the mitigating factors of "serious provocation" or "unreasonable belief in justification" are "less culpable mental states" than the mental states applicable to first degree murder. In *People v. Jerome* (1990), 206 Ill. App. 3d 428, 433-35, 564 N.E.2d 221,

224-26, the Second District Appellate Court, citing approvingly our decision in *Buckner*, rejected defendant's argument that the second degree murder statute is unconstitutional. In doing so, however, the court cited *Hoffer* and *People v. Guest* (1986), 115 Ill. 2d 72, 503 N.E.2d 255, and stated that "[i]n drafting the murder (now first-degree murder) statute, the legislature intended to retain the common-law concepts of express and implied malice but to replace those terms with the more modern and less ambiguous terms of intent and knowledge respectively." *Jerome*, 206 Ill. App. 3d at 435, 564 N.E.2d at 225.

We disagree with these portions of the *Swanson* and *Jerome* holdings regarding the new murder statutes. We do not believe that the legislature intended to retain the outmoded and difficult-to-use concepts of express and implied malice. Moreover, these holdings give the strongest possible support to defendant's argument, quoted earlier, that Public Act 84—1450, which created the murder statutes, is more appropriately judged by the standards of *Mullaney* than by the standards of *Patterson*, and is therefore unconstitutional. Even if we were inclined to agree with the holding in *Jerome*, the support that case provides to defendant's argument challenging the constitutionality of the second degree murder statute is reason enough to reject it. Contrary to *Jerome*, we agree fully with Professor O'Neill's scholarly analysis of the new statute, as follows:

> "[I]t is clearly constitutional to require the defendant to produce sufficient evidence of mitigation to reduce a charge of murder [from] first degree to second degree.
>
> The new Illinois scheme is strikingly similar to that found constitutional by the United States Supreme Court in *Patterson v. New York*. *Patterson* dealt with a state statute defining murder as intentionally causing the death of another person. It also provided that a person otherwise guilty of murder could reduce her offense to manslaughter if she proved by a preponderance of the evidence that she had acted under extreme emotional disturbance. The Court found such a scheme proper, because establishing the extreme emotional disturbance '[did] not serve to negative any facts of the crime which the State [had] to prove in order to convict of murder.'
>
> Likewise, under the new Illinois scheme a person who either intentionally or knowingly kills someone without justification is guilty of first degree murder. Establishing the mitigating circumstances of second degree—either sudden passion or unreasonable belief of self-defense—does not change the fact that the person is still a *murderer*; it merely results in a less severe pun-

ishment. Thus, the mitigating circumstances do not establish 'guilt' as defined in the Illinois Code; they merely prove that defendant is less culpable than other murderers. Therefore, placing this burden on the defense is constitutional." (Emphasis in original.) O'Neill, *An Analysis of Illinois' New Offense of Second Degree Murder*, 20 J. Marshall L. Rev. 209, 221-22 (1986) (hereinafter O'Neill).

We also agree with the following analysis by Professor Haddad:

"The new scheme does not require the defendant to bear the burden of negating the presence of any element of an offense. Under the new scheme there is no overlap between any element that the prosecution must prove to establish first degree murder and facts that the defense must prove to reduce the grade of the offense to second degree murder. The recent decision of *Martin v. Ohio* [(1987), 480 U.S. 228, 94 L. Ed. 2d 267, 107 S. Ct. 1098,] permitted Ohio to place on the defendant the burden of establishing self-defense. Under the analysis appearing in *Martin*, the less drastic Illinois scheme concerning grades of homicide appears constitutional." Haddad, *Second Degree Murder Replaces Voluntary Manslaughter in Illinois: Problems Solved, Problems Created*, 19 Loy. U. Chi. L.J. 995, 1016 (1988).

We have earlier discussed the checkered history of express and implied malice in the old Illinois homicide statutes as part of the explanation for our conclusion that one of the purposes of Public Act 84—1450 was to reject and repudiate the idea that these discredited notions continue to have validity in the new statutes defining first degree murder and second degree murder. In so concluding, we have taken into consideration the following guidance from the supreme court:

"[T]he judicial role in construing statutes is to ascertain legislative intent and give it effect. To aid in accomplishing this, a court will seek to determine the objective the legislature sought to accomplish and the evils it desired to remedy." (*People v. Scharlau* (1990), 141 Ill. 2d 180, 192, 565 N.E.2d 1319, 1324-25.) (See also *Secretary of State v. Mikusch* (1990), 138 Ill. 2d 242, 247, 562 N.E.2d 168, 170.) The supreme court recently reaffirmed these views when it wrote the following:

"The primary rule of statutory construction is to give effect to the intent of the legislature. As a starting point, a court should look to the language of the statute. [Citation.] All undefined words used within a statute 'must be given their ordinary and popularly understood meanings [citations].' [Citation.] When construing a statute, a court should additionally consider the

purposes to be achieved by the law." (*In re Estate of Callahan* (1991), 144 Ill. 2d 32, 43.)

(See also *DeClerck v. Simpson* (1991), 143 Ill. 2d 489, 492 (the verbiage of the statute must be given its plain and ordinary meaning, and the intention of the legislature is best surmised from the language of the statute).) To hold that the new statutes defining first degree murder and second degree murder incorporate and continue the discredited notions of express and implied malice diminishes both the clear language of these new statutes and the legislative intent in enacting them. That intent was to remedy the confusion, uncertainty, and inconsistency which had developed regarding the murder and voluntary manslaughter statutes.

We conclude our analysis in this section by quoting again from defendant's brief: "[T]he fundamental constitutional question here remains whether the mental state elements of first degree and second degree murder are in fact 'two inconsistent things: thus, by proving the latter the defendant would negate the former.' " For the reasons stated, we hold that the answer is clearly and emphatically "no" and, having so held, we further reaffirm our previous holdings in *Clark* and *Buckner* that the second degree murder statute is constitutional.

## C. *Second Degree Murder Is a Lesser Mitigated Offense, Not a Lesser Included Offense, of First Degree Murder*

■ An analysis of the second degree murder statute requires that the relationship between second degree murder and first degree murder be properly categorized. Even though several decisions of other appellate court districts have held that second degree murder is a lesser included offense of first degree murder, we disagree for the reasons that follow.

What constitutes a lesser included offense was discussed in *People v. Pumphrey* (1983), 115 Ill. App. 3d 1031, 1033, 451 N.E.2d 961, 963, as follows:

"A lesser included offense is defined as an offense which contains some but not all of the elements of the greater offense and which contains no element not included in the greater. (Ill. Rev. Stat. 1981, ch. 38, par. 2—9(a); [citations].) The supreme court has recognized the use of three tests helpful in determining whether an offense is a lesser included offense. The focus of the inquiry can be on the statutory definition of the greater offense, on the greater offense as charged or on the greater offense as proved at trial."

We agree with Professor O'Neill's view that second degree murder is not a lesser included offense of first degree murder and his explanation, as follows:

"A lesser included offense has either fewer elements or a less culpable mental state. Second degree murder does not have fewer elements [than] first degree murder; indeed, it embodies all of first degree murder *plus* mitigating circumstances. Nor does second degree murder technically have a less culpable mental state; like first degree, it requires an intentional or knowing state of mind." (Emphasis in original.) O'Neill, 20 J. Marshall L. Rev. at 224.

In order to describe the relationship between first degree murder and second degree murder, it will not suffice for us to say what that relationship *is not*—namely, that second degree murder is not a lesser included offense of first degree murder. Instead, we must state what that relationship *is*, and we now hold that second degree murder is a *lesser mitigated offense* of first degree murder: It is a *lesser* offense because its penalties upon conviction are lesser (compare Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1) (the penalty for first degree murder), with Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(4) (the penalty for second degree murder, a Class 1 felony)); and it is a *mitigated* offense because, as Professor O'Neill correctly explains, it is first degree murder *plus* defendant's proof by a preponderance of the evidence that a mitigating factor is present.

We fully recognize that the concept of a lesser mitigated offense is new to Illinois law, but so is the statutory scheme underlying second degree murder. We conclude that it is erroneous to try to fit second degree murder, a *sui generis* offense under the Illinois criminal code, into the "comfortable old shoe" of being a lesser included offense simply because no other recognized description seems to fit.

A good example of how analytical problems arise from such efforts is shown in *People v. Timberson* (1989), 188 Ill. App. 3d 172, 544 N.E.2d 64 (*Timberson I*), in which defendant's conviction in 1987 of second degree murder was reversed, and the case was remanded for a new trial. Thereafter, defendant filed a motion to dismiss the charge of first degree murder, arguing that the jury's previous verdict of second degree murder constituted an implied acquittal of the charge of first degree murder. The trial court denied defendant's motion, and he was subsequently tried and convicted of first degree murder. When defendant filed a post-trial motion, the trial court reconsidered its earlier ruling and granted defendant's request for a new trial, finding that it erred in denying his motion to dismiss the charge of first degree mur-

der. The State appealed and the Fifth District Appellate Court affirmed (*People v. Timberson* (1991), 213 Ill. App. 3d 1037, 1039, 573 N.E.2d 374, 375 (*Timberson II*)), holding that (1) defendant's conviction for second degree murder was an implied acquittal on the charge of first degree murder, and (2) defendant's second trial for first degree murder was barred by section 3—4(a) of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 3—4(a)) because second degree murder is a lesser included offense of first degree murder. (*Timberson II*, 213 Ill. App. 3d at 1040-43, 573 N.E.2d at 375-77.) See also *People v. Russell* (1991), 215 Ill. App. 3d 8, 14, 574 N.E.2d 258, 261-62, in which the Fifth District Appellate Court cited *Timberson II* approvingly for the proposition that second degree murder is a lesser included offense of first degree murder; and *Swanson* (211 Ill. App. 3d at 514-16, 570 N.E.2d at 506-07), also holding that second degree murder is a lesser included offense of first degree murder.

While we agree with the result reached in *Timberson II*, we disagree with its reasoning. Instead, we agree with the analysis of the First District Appellate Court in *People v. Thomas* (1991), 216 Ill. App. 3d 469, 472-73, 576 N.E.2d 1020, 1022-23, wherein the court was presented with an argument that the second degree murder statute was unconstitutional because defendant claimed it deterred those convicted of second degree murder from appealing their convictions. The court rejected this argument and wrote the following in response:

"Since second degree murder is not a lesser included offense of first degree murder, defendant reasons that if a defendant were to have his second degree murder conviction reversed and be granted a new trial, he could be retried for first degree murder. Thus, defendant argues, '[u]nlike other defendants, those convicted of second degree murder risk receiving a more severe sentence if they appeal.'

We disagree. As noted above, Criminal Code section 3—4(a) protected defendants convicted of the old offense of voluntary manslaughter from double jeopardy. (Ill. Rev. Stat. 1987, ch. 38, par. 3—4(a).) However, it is quite clear that Criminal Code section 3—4(b) protects a defendant convicted of second degree murder from being retried for first degree murder. (Ill. Rev. Stat. 1987, ch. 38, par. 3—4(b).) Section 3—4(b)(2) provides as follows:

'(b) A prosecution is barred if the defendant was formerly prosecuted for a different offense, or for the same offense based upon different facts, if such former prosecution:
                          * * *

(2) Was terminated by a final order or judgment, even if entered before trial, which required a determination inconsistent with any fact necessary to a conviction in the subsequent prosecution.' Ill. Rev. Stat. 1987, ch. 38, par. 3—4(b)(2).

Criminal Code section 3—4(b)(2) embodies the common law doctrine of collateral estoppel, which is included in the double jeopardy prohibition of the fifth amendment to the United States Constitution. (*People v. Shlensky* (1983), 118 Ill. App. 3d 243, 246-47, 454 N.E.2d 1103, 1105-06.) The doctrine provides that when a valid and final judgment determines an issue of ultimate fact, the same parties cannot again litigate the issue in any future lawsuit. [Citation.]

The doctrine of collateral estoppel requires that the issue of ultimate fact be controlling or material to both lawsuits; it matters not whether the lawsuits contain the same cause of action. Further, the record of the prior lawsuit must show that the trier of fact determined the issue. In other words, the fact finder must necessarily have decided the issue to render a verdict. Collateral estoppel will not bar the litigation of an issue in a second action if the record of the first lawsuit fails to show that the fact finder determined the issue. [Citations.]

When a defendant is charged with first degree murder, but convicted of second degree murder, the trier of fact necessarily determined that the defendant proved the existence of a mitigating factor. (*Buckner*, 203 Ill. App. 3d at 531, 561 N.E.2d at 339, quoting *People v. Shumpert* (1989), 126 Ill. 2d 344, 351-52, 533 N.E.2d 1106, 1109.) As a result, the State and defendant cannot again litigate the element of mitigation. [Citations.]

Thus, defendants convicted of second degree murder do not risk being put in jeopardy any more than defendants convicted of first degree murder. Consequently, we hold that defendants convicted of second degree murder are not denied the equal protection of the law." *Thomas*, 216 Ill. App. 3d at 472-73, 576 N.E.2d at 1022-23.

The erroneous classification of second degree murder as a lesser included offense of first degree murder can also cause the problem shown in the recent decision of *People v. Collins* (1991), 213 Ill. App. 3d 818, 572 N.E.2d 1005. In *Collins*, the First District Appellate Court reduced the defendant's conviction from first degree murder to second degree murder and remanded for resentencing, explaining its action as follows:

"We conclude that the evidence of record is too inconclusive, vague, and contradictory to sustain Collins' conviction of murder in the first degree. There is sufficient evidence, however, to support a conviction of second degree murder. We do not wish to understate the gravity of Collins' actions, nor exonerate him from the consequences of his criminal conduct. We nevertheless find that the degree of murder should be reduced under the specific circumstances of this case. Pursuant to Supreme Court Rule 615(b)(3) (134 Ill. 2d R. 615(b)(3)), we reduce the grade of offense from first to second degree murder and affirm it as modified. The cause must be remanded for resentencing also."
*Collins*, 213 Ill. App. 3d at 826-27, 572 N.E.2d at 1011.

We respectfully suggest that the conclusion of the *Collins* court—that the evidence against the defendant was "too inconclusive, vague, and contradictory" to sustain his conviction of first degree murder but was sufficient to sustain his conviction of second degree murder—is impossible to reconcile with the plain language of the second degree murder statute. However, the decision in *Collins* is entirely predictable and understandable if the court, as it must have done, is implicitly viewing second degree murder as a lesser included offense of first degree murder.

When second degree murder is viewed instead as being a lesser mitigated offense of first degree murder, then when an appellate court, as in *Collins*, determines that the evidence is "too inconclusive, vague, and contradictory" to sustain a defendant's conviction of first degree murder, the court would reverse defendant's conviction outright. Because second degree murder is—*by statutory definition*—first degree murder *plus* a mitigating factor, if the evidence is insufficient to prove the elements of first degree murder beyond a reasonable doubt, *no* murder conviction of any kind can be permitted to stand.

Underlying the decisions of the Fifth District Appellate Court in *Timberson II* and *Russell*, and also implicit in the argument defendant makes in the present appeal, is the view that the second degree murder statute was written "with the specific intention of retaining all of the substantive law, both statutory and case law, previously applicable to the statute defining the offense of voluntary manslaughter." (*Timberson II*, 213 Ill. App. 3d at 1042, 573 N.E.2d at 377.) In *Russell*, the court stated the matter even more strongly:

"Since the second-degree murder statute was written for the purpose of substituting the new name, but not a whole new body of law, for the old voluntary manslaughter crime, those earlier cases [holding a conviction of voluntary manslaughter operated

as an acquittal of a murder charge] still control on this issue." (*Russell*, 215 Ill. App. 3d at 14, 574 N.E.2d at 261.) We recognize that such statements are made in the authority cited by the *Timberson II* and *Russell* courts, but they have been taken out of context and are being read too broadly.

■ We therefore disagree with these assessments and adhere to the views this court expressed in *Buckner*: all substantive statutory and case law pertaining to voluntary manslaughter and murder under the old law is applicable to first degree murder and second degree murder under the new law, *but only to the extent that the prior statutory and case law is not inconsistent with the new statutory scheme of the second degree murder statute.* (*Buckner*, 203 Ill. App. 3d at 532, 561 N.E.2d at 340.) It is easy to find examples of decisions that predate the enactment of Public Act 84—1450 but are still good law. The validity of case law spanning decades continues unabated in its explanation of what is "a sudden and intense passion resulting from serious provocation," as well as its explanation of the concept of an "unreasonable belief in self-defense." For example, see *People v. Wilson* (1972), 3 Ill. App. 3d 481, 486, 278 N.E.2d 473, 477 ("sudden and intense passion resulting from serious provocation cannot be followed by a period of time sufficient for the passion to cool and the voice of reason to be heard"); *People v. Crews* (1967), 38 Ill. 2d 331, 335, 231 N.E.2d 451, 453 (mere words or gestures or trespass to property cannot constitute serious provocation); *People v. Johnson* (1972), 4 Ill. App. 3d 249, 251, 280 N.E.2d 764, 766 (defendant's state of mind at time he stabbed unarmed man who was attacking him was critical element in determining whether defendant acted reasonably); *People v. Diaz* (1976), 38 Ill. App. 3d 447, 453-54, 348 N.E.2d 199, 205 (even if defendant reasonably believed the victim was armed and presented serious threat to defendant, defendant's use of force to the extent of shooting victim three times, once in the back, was unnecessary to prevent such harm, entitling jury to reject defendant's claim of self-defense and return verdict of voluntary manslaughter). See also *People v. Johnson* (1991), 215 Ill. App. 3d 713, 727-29, 575 N.E.2d 1247, 1256-57, wherein the First District Appellate Court, when deciding whether the trial court in a first degree murder case abused its discretion by refusing defendant's offer of second degree murder instructions based upon "serious provocation," considered five cases dealing with "serious provocation," all of which were decided under the old voluntary manslaughter statute.

As this court held in *Clark*, "it is within the legislature's province to define criminal offenses." (*Clark*, 207 Ill. App. 3d at 449, 565

N.E.2d at 1379.) We now add that it is also within the legislature's province, as here, to correct deficiencies and to overcome confusion in preexisting statutes which define criminal offenses, such as those present regarding murder and voluntary manslaughter under the old law. As pointed out by Professors Haddad and O'Neill, the legislative intent in the enactment of the second degree murder statute was clearly to eliminate the confusion and problems of the old law, as illustrated in the *Hoffer, Wright,* and *Fausz* cases. The construction of the second degree murder statute by the Fifth District Appellate Court in *Timberson II* and *Russell*—holding that *all* of the substantive law previously applicable to the offense of voluntary manslaughter was retained in the second degree murder statute—renders the enactment of that statute a nugatory act, done *solely* for the ridiculous purpose of simply changing the name of the offense.

### III. Defendant's Request That His Conviction For First Degree Murder Should Be Reduced To A Conviction For Second Degree Murder

■ As an alternative argument, defendant claims his conviction of first degree murder should be reduced to second degree murder. In support of his claim, defendant states the following:

> "In the instant case, [defendant] testified extensively concerning his actions after Lawrence Rainer grabbed him by the throat and began to strangle him. This uncontradicted testimony establishes by a preponderance of the evidence that [defendant] acted in a sudden impulse of passion brought about by the serious provocation of being attacked by Rainer."

While defendant is correct that this testimony is uncontradicted, in large measure that is because defendant killed the only person who was in a position to contradict it, namely, Rainer. We also note that defendant's testimony regarding this point is uncorroborated; it was Rainer's body, not defendant's, that bore the marks of being beaten and stabbed. Furthermore, while Thompson testified he could not see the interaction between defendant and Rainer behind the bus shelter at the time Rainer was stabbed, his testimony regarding what he could see immediately prior thereto is totally inconsistent with defendant's claims.

In *People v. Purdle* (1991), 212 Ill. App. 3d 594, 571 N.E.2d 178, the Third District Appellate Court was presented with a similar request to reduce defendant's conviction from first degree murder to second degree murder. The court declined to do so, explaining as follows:

> "Lastly, we agree with the State that the current statutory scheme for homicide does not readily lend itself to reductions in

degree by this court from murder in the first degree to murder in the second based on an imperfect self-defense (unreasonable belief that lethal force is justified). While there was certainly *some* evidence of defendant's unreasonable belief, we do not find that such evidence clearly outweighed the State's evidence indicating that no such mitigating factor existed at the time of the killing. Accordingly, we will not disturb the judgment of conviction as entered by the circuit court of Peoria County." (Emphasis in original.) *Purdle*, 212 Ill. App. 3d at 600, 571 N.E.2d at 182.

We agree with the *Purdle* court that the current statutory scheme for homicide "does not readily lend itself to reductions in degree" on appeal from first degree murder to second degree murder based on a claim of unreasonable belief that self-defense was justified. Contra *Collins*, 213 Ill. App. 3d 818, 572 N.E.2d 1005.

Reviewing the record before us, we are satisfied that the jury was fully justified in finding that defendant had failed to meet his burden of proving by a preponderance of the evidence that the mitigating factor of "serious provocation" was present. In so concluding, we hold that defendant's burden in this case (to prove by a preponderance of the evidence the presence of a mitigating factor under the second degree murder statute) is precisely equivalent to that of a defendant in a civil case who has asserted an affirmative defense. We will not overturn the jury's finding that defendant failed to meet his burden of proof unless that finding is clearly contrary to the manifest weight of the evidence (see *Klaskin v. Klepak* (1989), 126 Ill. 2d 376, 389, 534 N.E.2d 971, 976; *Gerill Corp. v. Jack L. Hargrove Builders, Inc.* (1989), 128 Ill. 2d 179, 197, 538 N.E.2d 530, 538); the jury's finding in the present case was not clearly contrary to the manifest weight of the evidence.

## IV. The Prosecutor's Allegedly Improper Questioning Of Defendant

■ Defendant's last argument is that the prosecutor improperly cross-examined him by asking his opinion concerning the veracity of another witness. The cross-examination in question reads as follows:

"Q. [Prosecutor:] Okay. Well, let's move on [to] the next person you talked to. You talked to Officer Resch. You saw him in court, right?

A. [Defendant:] The one [who] was dressed in plain clothes?

Q. No. He's the one in a uniform.

A. Yes.

Q. Okay. And, he's the first policeman to talk to you; and did you tell Officer Resch that you had pulled out a knife and had to stab Lawrence in self-defense, yes or no?

A. As I recall, yes, I did tell him that.

Q. Okay. So, Officer Resch didn't tell the complete story when he took the witness stand?

A. I told him. I told him, yes, I stabbed him. I told the other detective I stabbed him too.

Q. So, you're saying, under oath, that you told Officer Resch that you stabbed Lawrence Rainer with a knife?

A. As I recall, I do remember telling him that I stabbed him."

Defendant acknowledges that he did not object at trial to the above cross-examination but maintains that the error was so egregious that it should be viewed as plain error. (See 134 Ill. 2d R. 615(a).) We disagree and view this isolated reference by the prosecutor to whether Officer Resch had told "the complete story when he took the witness stand" to be *de minimis* and far short of a circumstance authorizing the finding of plain error.

## V. CONCLUSION

For the reasons stated, defendant's conviction of first degree murder is affirmed.

Affirmed.

SPITZ, J., concurs.

PRESIDING JUSTICE LUND, specially concurring:

Our esteemed colleague, author of the opinion, was one of those instrumental in the drafting of the legislation adopting first and second degree murder. In the past, he has used his intellectual talents joining with others lecturing on the subject of sections 9—1 and 9—2 of the Code. While I am convinced the constitutional issue presented in the instant case can be decided based upon our court's decision in *People v. Buckner* (1990), 203 Ill. App. 3d 525, 530-34, 561 N.E.2d 335, 339-41, I recognize the value of this opinion for purposes of meaningful discourse.